WAUKESHA GAS & ELECTRIC COMPANY, Appellant, vs.
RAILROAD COMMISSION OF WISCONSIN, Respondent.

*May 4—July 14, 1923.*

*Public utilities: Reasonable rate: Railroad commission: Duty to
fix rate: Interference by court: When rate confiscatory: Fair
value of property used: How determined: Prudent-invest-
ment cost: Reproduction less depreciation: Right of munici-
pality to purchase: Going-concern value: Working capital:
Temporary deficit of utility: Questions of public policy.*

1. The proper basis of rates chargeable by a public utility is the
present fair value of property used or useful in affording
public service, such value to be established as of the time
when the reasonableness of the rates charged is under investi-
gation.
2. The power to establish public utility rates is a function of the
administrative or legislative branch of the government. The
courts have nothing to do with the establishment of rates as
such, but have the power to set aside a rate which by reason
of insufficiency is confiscatory.
3. A rate which does not permit the utility to earn a reasonable
return on the present fair value of the property at the time
it is being used for the public is confiscatory, and therefore
from a judicial standpoint unreasonable.
4. From the legislative standpoint a rate may be reasonable when
not unfair to the consumer, though permitting the utility to
earn a return much beyond the legal rate of interest on the
money invested.
5. Before a court can declare a rate unreasonably low it must
clearly appear that it will yield less than the minimum return
which invested capital has a right to demand; and the court
in its deliberations should exclude questions of public policy,
as the determination of matters of policy rests with the legis-
lature.
6. It is the duty of the railroad commission to fix just and reason-
able rates to be charged by public utilities, which must not
be so low as to approach the line of confiscation nor so high
as to be unjust or oppressive. A "just and reasonable" rate
need not approach either line.
7. The commission is not a court, but a fact-finding body charged
with the duty of administering the law; the theory being that
there is a rate which as between a public utility and the
public is just and reasonable, and it is that rate which the
commission is supposed to ascertain and declare.

8. While the railroad commission has no power to choose as a matter of policy between the different rates, but can only ascertain what rate is just and reasonable, if in ascertaining the just and reasonable rate the result reached is within the zone of reasonableness it must be judicially approved. Such "just and reasonable" rate is not necessarily the minimum rate which will stand the constitutional test. *Eau Claire v. Wisconsin-Minnesota L. & P. Co.* 178 Wis. 207, modified.

9. In determining whether the rate fixed by the railroad commission is confiscatory and therefore unjust and unreasonable, the court is not primarily concerned with the rate base found by the commission, but must determine for itself the present fair value of the property, that being a judicial question.

10. The fact that the public, under sec. 1797m—82, Stats. 1921, has the perpetual right to take the property of the utility upon making just compensation therefor must be given great weight in determining the present fair value of the property for rate-making purposes.

11. In view of secs. 1797m—46, 1797m—74, 1797m—82, and 1797m—87, Stats. 1921 (under which public utilities operate under indeterminate permits giving the public the right to take the property of the utility on making just compensation, and requiring the furnishing of adequate service for a reasonable charge), the cost of reproduction new less depreciation, though to be considered, is not entitled to controlling or even considerable weight under abnormal conditions in determining the present fair value of property for rate-making purposes; and controlling weight should be given the investment cost if the investment was prudently made.

12. Under said sec. 1797m—82 "just compensation" means the fair and reasonable value of the property taken at the time possession is acquired, which is to be arrived at in the exercise of a sound and competent business judgment upon the various elements of value, considering the property as a going business utility.

13. The fact that under sec. 1797m—82 the utility has consented that the public may take its property at a just compensation to be fixed by the railroad commission, does not imply a right on the part of the public to establish a confiscatory rate.

14. In this case it is *held* that, giving due weight to actual cost, to cost of reproduction new less depreciation, the proper allowance for working capital and going-concern value, and other factors, a schedule of rates which will earn a reasonable return on $424,868 (the value of the utility as found by the railroad commission) is not unjust and unreasonable, although a more generous allowance for going-concern value would have been fully warranted.

15. If this court were to accord rank to the various factors in accordance with the weight to be given in determining present fair value for rate-making purposes, the schedule would be: (a) actual cost if investment were prudently made; (b) cost of reproduction new less depreciation (under normal conditions only); (c) going-concern value; (d) working capital; and (e) other elements of value which may be presented in a particular case.

16. In valuing the plant of a public utility for rate-making purposes, it must be presumed that the investment was prudently made, in the absence of satisfactory proof to the contrary.

17. The fact that an electric company in one year failed to earn operating expenses and proper depreciation charges because of inability to secure proper coal, due to strikes which were not only abnormal but temporary and the effects of which have ceased, was one of the hazards of the business.

18. In the effort to find the just and reasonable rate, the railroad commission may and should consider not only the legal rights of the parties, but, within the field prescribed by the legislature, the broader questions of public policy which are necessarily involved. The courts, however, must determine, without regard to questions of policy, whether the rates established permit the utility to earn a reasonable return upon the fair value of its plant.

Jones, J., dissents.

Appeal from a judgment of the circuit court for Dane county: E. Ray Stevens, Circuit Judge. *Affirmed.*

Action to review determination of the *Railroad Commission* of March 28, 1921, refusing to permit the plaintiff to increase its rates for electric service in the city of Waukesha. On November 18, 1913, the *Railroad Commission* established electric rates for the plaintiff company upon a property valuation of $156,800 (*Waukesha v. Waukesha G. & E. Co.* 13 Wis. R. R. Comm. Rep. 100). This valuation was the result of a complete inventory and appraisal of the company's electrical property made by the *Commission's* engineers, to which the *Commission* made additions to represent working capital and going-concern value. The engineers' appraisal of the physical property was $118,423, being the cost of reproduction less depreciation, as of June 30, 1912, to which the *Commission* added the cost of the additions made by the company during the year ending June

30, 1913, of $13,623, a total plant value of $132,046. To the value of materials on hand, $11,877, the *Commission* added $1,500, which represented the working capital amounting to $13,377, making a total of $145,423. The *Commission* then gave consideration to other factors entering into the fair value of the utility, and arrived at the conclusion that the fair value of the utility as of that date was $156,800. The valuation so fixed has not been attacked.

In 1919 it became necessary to revise the company's electric rates because of increasing expenses. The company applied to the *Railroad Commission* for permission to increase its rates. Upon the hearing the *Railroad Commission,* instead of making a new inventory and appraisal, brought the 1913 appraisal down to date by adding to it the cost of the additions made to the company's electrical property in the interim. *Application of Waukesha G. & E. Co.* 22 Wis. R. R. Comm. Rep. 672. The resulting valuation was $368,171, as of June 30, 1918. The rates calculated by the *Commission* upon this valuation were put into effect, and it is these rates which the *Commission* refused to permit the company to increase in the proceeding now before the court.

The application for leave to increase these rates was made to the *Commission* in September, 1920. In arriving at a valuation to be used as a rate base, the *Commission* employed the same method as in 1919, namely, the ascertainment of present value by adding to the 1913 valuation the additions made by the company to its electrical property in the intervening years. The resulting valuation as of June 30, 1920, was $424,868.

The *Commission* determined that upon this rate base, with proper operating economy in the ensuing year, the utility would earn a fair return without an increase in electrical rates. The correctness of this determination is in issue here, and the principal matter argued is whether the *Commission* in making its decision arrived at the fair value

Waukesha Gas & E. Co. v. Railroad Comm. 181 Wis. 281.

of the property as a rate base in the making of its calculations.

The situation of the utility is best disclosed by the following table:

*Return Earned by Electric Utility.*

| Year ending June 30. | Average value of property— Table I. | Available for depreciation and return. | Required for depreciation— Table II. | Available for return. | Per cent. on average value |
|---|---|---|---|---|---|
| 1913 | $149,988 | $18,222 | $4,314 | $13,908 | 9.27 |
| 1914 | 183,891 | 21,611 | 5,501 | 16,110 | 8.76 |
| 1915 | 218,028 | 33,567 | 6,695 | 26,872 | 12.32 |
| 1916 | 240,822 | 45,815 | 7,493 | 38,322 | 15.91 |
| 1917 | 280,569 | 31,828 | 8,884 | 22,944 | 8.18 |
| 1918 | 336,370 | 20,066 | 10,837 | 9,229 | 2.74 |
| 1919 | 385,085 | 19,193 | 12,542 | 6,651 | 1.73 |
| 1920 | 413,433 | 51,806 | 13,535 | 38,271 | 9.25 |
| Average | $276,023 | | | $21,538 | 7.80 |

Engineers for the plaintiff made a physical valuation of the property upon the basis of a five-year average new. Upon that basis they found the total value of the property used and useful properly apportionable to the electrical utility to be $686,951, allowing $32,400 for working capital and $65,000 for going value, making a valuation for the physical property of $589,551, and that the so-called present value or the reproduction new less depreciation as of December 31, ·1919, was $594,904, as against the $424,868 found by the *Commission.*

The application to increase the rates having been denied by the *Commission,* the plaintiff began this action in the circuit court for Dane county to review the action of the *Commission.* Upon the hearing the circuit court affirmed the findings of the *Commission* and dismissed the action, and from an order dismissing the action the plaintiff appeals.

For the appellant the cause was submitted on the brief of *Jacobson & Malone* of Waukesha.

For the respondent there was a brief by the *Attorney General* and *Ralph M. Hoyt* of Milwaukee, special counsel, and oral argument by *Mr. Hoyt*.

A brief was also filed by *Fred S. Hunt* of Milwaukee as *amicus curiæ*.

ROSENBERRY, J.    The principal contentions of the plaintiff may be stated as follows:

"(1) The valuation of the property of a public utility upon which it is entitled to a fair return must be determined as of the time when the inquiry is being made regarding the reasonableness of rates, giving the company the benefit of any increase in the value of the property since it was acquired.

"(2) In determining present fair value consideration must be given to the present or reproduction cost as well as to the original cost.

"(3) It is well established by all authorities that in addition to the applied physical value of the property there should be added for rate-making purposes adequate allowances for 'working capital' and for 'going value.'

"(4) The amounts fixed as going value and working capital by the *Commission* in 1913 have never been changed and are totally inadequate at the present time.

"(5) In determining a base for rate-making purposes accrued depreciation should not be deducted from the reproduction cost new in arriving at present value, especially where the utility has not earned sufficient revenue to provide a reasonable return including enough to maintain accrued depreciation, but continues to render service to the public."

The real controversy in this case arises from the fact that the *Commission* allowed no accretion in value for that part of the electrical plant acquired by the utility prior to June 30, 1913. It is contended that the present fair value of the property used or useful in affording the public service is the measure of the reward to which the owner of that property is entitled for the service rendered, such value to

be established as of the time when the inquiry in regard to the reasonableness of the rates charged by the utility is under investigation. This contention is in accord with the well settled law upon the subject. *Willcox v. Consolidated Gas Co.* 212 U. S. 19, 29 Sup. Ct. 192.

In the consideration of the question presented it is well to bear in mind a few fundamental propositions. The courts have nothing to do with the establishment of rates as such. The power to establish rates is primarily and exclusively a function of the administrative or legislative branch of the government. *Louisville & N. R. Co. v. Garrett,* 231 U. S. 298, 34 Sup. Ct. 48; *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491.

When the properly constituted authorities have established a rate, which rate is by reason of insufficiency confiscatory, the courts have the power, in the enforcement of the provisions of our constitution, to set the rate aside. *Smyth v. Ames,* 169 U. S. 466, 522–526, 18 Sup. Ct. 418; *Interstate Comm. Comm. v. Union Pac. R. Co.* 222 U. S. 541, 32 Sup. Ct. 108; *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65.

A rate which does not permit the utility to earn a reasonable return upon the present fair value of the property at the time it is being used for the public is confiscatory, and therefore, from a judicial standpoint, unreasonable, while from the legislative standpoint a rate may be reasonable which is not unfair to the consumer although it may permit the utility to earn a return much beyond the legal rate of interest on the money invested. *Detroit & M. R. Co. v. Michigan R. R. Comm.* 203 Fed. 864.

It may as well be said here as anywhere that the courts approach the question of whether or not a rate is reasonable from an entirely different standpoint than does the *Commission.* Before the court can declare that a rate is unreasonably low it must clearly appear that it will yield less than the minimum return which invested capital has a right to

demand.   The court must and should in its deliberations exclude questions of public policy.   The determination of matters of policy rests with the legislature.

A considerable study of cases leads to the conclusion that since *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. 418, commissions have regarded it as their duty to apply the court rule and establish a rate schedule which shall yield a minimum return and yet not bring their determination within the field of constitutional condemnation.   It is the duty of the commission to prevent unreasonable exactions by the utility on the one hand, and also to protect the rights of investors from confiscation by imposition of rates which are too low on the other.   The rate should be, in the language of the statute, "just and reasonable;" in other words, not so low as to approach the line of confiscation nor so high as to be unjust and oppressive.   A just and reasonable rate need not approach either line.   *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592 (142 N. W. 491), at p. 611.

In order for the court to ascertain whether or not a rate prescribed by the *Commission* is reasonable, it must first determine the present fair value of the property actually used and useful for the convenience of the public.   This value when established constitutes the rate base and is the amount upon which the utility is entitled to earn a reasonable return.   It is the claim of the utility in this case that the amount which it can earn under the rates established by the *Commission* will not afford a fair return to the electrical utility, for the reason that the rate base should be $594,904 instead of $424,868, the amount found by the *Commission* to be the present fair value of the property.   Under the present utility law we have nothing to do with the intricacies of rate-making, with questions of management, and other factors which may operate to increase or diminish the revenues under the established rate.

The *Commission* establishes the present fair value of the property as a guide.   The problem before the *Commission*

is not a legal problem but an administrative problem. The *Commission* is not a court but a fact-finding body, charged with the duty of administering the law. In building up a rate the *Commission* must necessarily take into consideration a great many factors. Many of these factors are indefinite and incapable of exact delimitation. To properly weigh these various factors requires long experience and much wisdom. The just and reasonable rate of the statute in a particular case is arrived at by giving just weight and consideration to each of them as applied to the facts in a particular case. The main purpose of the *Commission* ascertaining the just and fair value of the property is to ascertain whether or not the rate when established will be valid in the light of the constitutional provision, and it is only one of the innumerable factors which enter into the process of rate-making. Theoretically, there is some rate which is as between the utility and the public just and reasonable, and it is that rate which the *Commission* is supposed to ascertain and declare. *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 116 N. W. 905; *Eau Claire v. Wisconsin-Minnesota L. & P. Co.* 178 Wis. 207, 189 N. W. 476, 479.

It may be supposed that there is some conflict between the views here expressed and the views of the court as expressed in *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm., supra.* When correctly understood, we apprehend there is no conflict. It is there said:

"This law (ch. 362, Laws of 1905) establishes, and thenceforth assumes, the existence of rates, charges, classifications, and services discoverable by investigation, but undisclosed, which are exactly reasonable and just. It commits to the *Railroad Commission* the duty to ascertain and disclose that particular rate, charge, classification, or service. The law intends that there is only one rate, charge, or service that is reasonable and just. . . . If it were conceded that the *Commission* had power or discretion to fix one of several rates, either of which would be just and reasonable,

it would be hard to say that this was not a delegation of pure legislative power to the *Commission*. But the theory of this law is to delegate to the *Commission* the power to ascertain facts and to make mere administrative regulations."

It must be borne in mind that there is a clear distinction between the power of the *Railroad Commission* under the statute, acting within the field of reason, to ascertain and declare a just and reasonable rate and the power of the court to disturb the determination of the *Commission* when it has been declared. Having regard to the statute solely, it is apparent that the determination of the *Commission* cannot be disturbed unless it shall be made to appear to the court by clear and satisfactory evidence that the rate established by it is either unreasonably low or unreasonably high. The court is not called upon to substitute its judgment for that of the *Commission* as to what the rate should be. In building up the rate the *Commission* must necessarily consider not only the legal rights of the parties, but, as has been pointed out, matters of public policy, and must give weight to the various factors entering into the problem. The court cannot disturb the finding of the *Commission* unless it can say that the established rate has no basis in reason. It is manifest, therefore, that there is a zone within which the determination of the *Commission* cannot be disturbed. This does not mean that the *Railroad Commission* has power to choose as a matter of policy between the different rates, but that if in the exercise of its judgment in ascertaining the just and reasonable rate the result reached is within the zone of reasonableness, it must be judicially approved. Were it not for the constitution, the *Commission* might lawfully establish a rate which would yield less than the return upon the present fair value of the property, which is the minimum under the Fourteenth amendment. It might be argued with reason that, the state having attempted to create a monopoly and to protect specially the business and property

of a public utility, the utility should for that reason accept less than a reasonable return upon other invested capital. The minimum, however, is established by the rule announced by the United States supreme court under the Fourteenth amendment.

There has been but little consideration given to establishing the maximum limit beyond which the *Commission* cannot go. We shall not discuss it here. What might be a reasonable return in one case might not be a reasonable return in another, having due regard to all the conditions and circumstances of each case. Manifestly, the just and reasonable rate is not necessarily the minimum rate which will stand the constitutional test. If that were true, the *Commission* could not give weight to any other factor or factors in rate-making, either in the interest of the public or the utility, and would be bound by the naked legal rights of the parties. Anything in *Eau Claire v. Wisconsin-Minnesota L. & P. Co.* 178 Wis. 207, 189 N. W. 476, which seems to hold to the contrary must be held to be modified. While there is in theory but one just and reasonable rate, the rate found and declared by the *Commission* is not subject to judicial review if the *Commission* in its determination acted within the field of reasonableness.

The rate having been established, the power of the court is invoked in this case to declare it confiscatory and therefore unjust and unreasonable. The primary question before the court is not a criticism of the methods adopted by the *Commission* in building up the rate or fixing the rate base. The primary question before the court is whether or not the established rate will permit the utility to earn, upon the present fair value of its property, a reasonable return. The question, therefore, of what is the present fair value of the property is a judicial problem. The court is not primarily concerned with the rate base found by the *Commission,* but must determine for itself the present fair value of the property. These considerations bring us to one of the most

complex and involved subjects with which courts are called upon to deal.

We enter with hesitation upon a discussion of a subject which is so highly controversial. All agree that the rate base is the present fair value of the property used and useful for the convenience of the public in rendering the service which the utility undertakes to perform. The question is how shall that value be ascertained. We have been aided in our consideration of this matter by an article by Dr. Robert L. Hale, entitled "Valuation and Rate Making," published in Vol. 80, No. 1, "Studies in History, Economics, and Public Law," by the Columbia University Press in 1918. Inasmuch as the writer discusses particularly the decisions of the Wisconsin Railroad Commission, the article is valuable for that reason as well as for the discussion of the subject generally.

In three recent cases the supreme court of the United States has dealt with this problem. *State ex rel. Southwestern Bell Tel. Co. v. Public Service Comm.* 43 Sup. Ct. 544, decided May 21, 1923; *Bluefield W. W. & I. Co. v. Public Service Comm.* 43 Sup. Ct. 675, decided June 11, 1923; *Georgia R. & P. Co. v. Railroad Comm.* 43 Sup. Ct. 680, decided June 11, 1923. These decisions have not entirely clarified the situation.

In the *Southwestern Bell Tel. Co. Case* the determination seems to rest almost entirely upon a review of the procedure of the commission, and while the case distinctly holds that weight must be accorded to cost of reproduction new less depreciation, we look in vain for any statement as to what weight should be accorded to that factor. It is said "Estimates for tomorrow cannot ignore prices of today," which would seem to indicate that it was the duty of the commission to take into consideration future price levels, although the opinion declares that it is the present fair value of the property upon which the utility is entitled to earn a reasonable return.

In the *Bluefield W. W. & I. Co. Case* it is said:

"The final figure, $460,000, was arrived at substantially on the basis of actual cost less depreciation plus ten per cent. for going value and $10,000 for working capital. This resulted in a valuation considerably and materially less than would have been reached by a fair and just consideration of all the facts. The valuation cannot be sustained."

In this case as well as in the *Southwestern Bell Tel. Co. Case,* while it is clearly held that the plaintiff in error is entitled to the independent judgment of the court upon both the law and the facts, and that it is the duty of the court, under the Fourteenth amendment, to ascertain for itself whether or not the rates prescribed permit the utility to earn a reasonable return upon the present fair value of the property, we are unable to deduce from the opinion any hint as to the weight which the factor, cost of reproduction new less depreciation, should be given either by a court or a commission.

In the *Georgia R. & P. Co. Case* it is said:

"The rule laid down in these cases [*Minnesota Rate Cases,* 230 U. S. 352, 33 Sup. Ct. 729; *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. 418, and *Willcox v. Consolidated Gas Co.* 212 U. S. 19, 29 Sup. Ct. 192] was expressly recognized as controlling, both by the commission and by the lower court. Evidence bearing on most of the facts there declared to be relevant facts was before them. The court states, and the record establishes, that 'the opinion of the . . . commission . . . evinces a full and conscientious consideration of the evidence.' The opinion of the court shows that it also made careful examination of the evidence submitted and that it recognized the applicable rules of law. While it differed from the commission in some matter of detail, it sustained the latter's finding that the value was $5,250,000. The question on which this court divided in the *Southwestern Bell Tel. Co. Case, supra,* is not involved here."

Unless the mere assertion by commissions and courts that they have considered the cost of reproduction new is suffi-

cient to conclude the appellate court, we are unable to see a distinction between the *Georgia R. & P. Co. Case* and the two prior cases referred to. In the *Georgia R. & P. Co. Case* we get no indication as to the weight which is to be attached to the cost of reproduction new less depreciation factor. It cannot be that the repetition of a mere legalistic formula before the declaration of the trial court's final determination is sufficient to bless and sanctify the result, no matter what it may be.

The finding of the rate base by an administrative commission is not conclusive upon the court. In our view of the matter, what the court is called upon to do is to determine for itself the present fair value of the property in order to establish a rate base and not merely to review the work of the commission. The commission proceeds in the field of administrative law. The problem presented to the court is a judicial problem. It cannot be said that the conclusion of the commission is conclusive upon the court however arrived at, unless it be said that the commission is vested with the right to exercise judicial power.

"The idea that any legislature, state or federal, can conclusively determine for the people and for the courts that what it enacts in the form of law, or what it authorizes its agents to do, is consistent with the fundamental law, is in opposition to the theory of our institutions. The duty rests upon all courts, federal and state, when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation. This function and duty of the judiciary distinguishes the American system from all other systems of government. The perpetuity of our institutions and the liberty which is enjoyed under them depend, in no small degree, upon the power given the judiciary to declare null and void all legislation that is clearly repugnant to the supreme law of the land." *Smyth v. Ames,* 169 U. S. 466, 527, 18 Sup. Ct. 418.

In the determination of the questions presented by the

record in this case it is our duty to take into consideration some factors which did not appear in the three cases recently decided by the supreme court of the United States.

*First.* In this case the property of the utility is held under an indeterminate permit (sec. 1797*m*—74, Stats.). The nature of the indeterminate permit was discussed in *Calumet Service Co. v. Chilton,* 148 Wis. 334 (135 N. W. 131), at p. 355, and cases cited.

*Second.* By the terms of the indeterminate permit the municipality has a perpetual right to take the property of the utility upon making just compensation (sec. 1797*m*—82). *Connell v. Kaukauna,* 164 Wis. 471, 159 N. W. 927, 160 N. W. 1035.

*Third.* A public utility is, under the law of Wisconsin, required to furnish adequate service for a reasonable charge, and this duty may be enforced by the *Commission* (sec. 1797*m*—46) and also by the municipality in which the utility is situated (sec. 1797*m*—87). The public utility may therefore be required to make additions to its property used and useful for serving the public by public authority without regard to past, present, or future price levels.

The factors which are to be considered in determining the just compensation to be paid by the municipality are quite fully discussed in *Oshkosh W. W. Co. v. Railroad Comm.* 161 Wis. 122, 152 N. W. 859. See, also, *Appleton W. W. Co. v. Railroad Comm.* 154 Wis. 121, 142 N. W. 476.

It would seem in Wisconsin that the present fair value of the property of a public utility could never exceed the price at which the public has a perpetual right to purchase it. If that is not wholly true, certainly the fact that the public has a·perpetual right to purchase must be given great weight in determining the present fair value of the property.

*Fourth.* The state guarantees to the utility a monopoly by prohibiting competition except it be established upon a public hearing that public convenience and necessity require

a second utility.    This provision applies to municipalities desiring to enter the utility field as well as to private corporations (sec. 1797m—74).

Recent decisions having left us without a guide as to the weight which is to be attached to the cost of reproduction new less depreciation factor, we are obliged to consider that matter for ourselves.    The fundamental principle is stated in the *Minnesota Rate Cases,* 230 U. S. 352 (33 Sup. Ct. 729), at p. 454, as follows:

"The making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost.    The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law."

It should be noted that it is the property which the constitutional guaranty protects and not a particular theory of valuation.    Before the jurisdiction of the court can be successfully invoked it must appear that the property of the plaintiff is being taken, not that it is deprived of the benefit of market fluctuations in the value of materials and labor. With all due respect, the proposition that the cost of reproduction new less depreciation, although it should no doubt be considered, is entitled to controlling or even considerable weight under present abnormal conditions, appears to us to be unsound.    In the first place it ignores the fact that under *Munn v. Illinois,* 94 U. S. 113, when a person dedicates his property to a public use by investing it in a public utility, he divides with the people the right to control the use of the property so dedicated and thereafter the public has an interest in the use of the property which it may within constitutional limitations assert.    That so investing his property the investor has given to it a status is now well established and recognized in the law.    He withdraws it from the great mass of property not so situated and subjects it to a degree of public control from that time on.

2d. Cost of reproduction new can be established only theoretically. Even in the case of a structure about to be erected, every-day experience fully confirms this. When applied to the property of a public utility, purchased under conditions which no longer exist and incorporated into the property of a public utility under circumstances that cannot be reproduced, it is not only theoretical but highly speculative.

3d. The property of a public utility cannot be valued as is other property not devoted to the public use, which is subject to the laws of competition and therefore in an entirely different class. *In re Purchase of Racine Waterworks Plant*, 19 Wis. R. R. Comm. Rep. 83, at pp. 143–145 for discussion.

4th. In the competitive field the cost of reproduction new is given minor consideration in fixing the value of property because in that field the value is determined largely by its usability. For instance, would any one claim that the cost of reproduction new is even a guide to the present value of a defunct brewery plant? In the valuation of an office building the amount which it earns is a much larger factor in determining its value than cost of reproduction new. The usability or earning capacity being in a competitive field a dominant factor in the ascertainment of present fair value and the cost of reproduction new being at least a minor factor, how can it be said that it is entitled to great weight in valuing the property of a public utility when the earning power is limited by law? *In re Laporte G. & E. Co.* 1921A Pub. Util. Rep. 824, at pp. 844 *et seq.*

5th. If the cost of reproduction new is to be accorded any considerable weight when the price level rises, it must be accorded the same weight when the price level falls. Utilities in Wisconsin, however, are not permitted, except within very narrow limits, to consider price levels, but are required to furnish an adequate service when and as needed, irre-

spective of price levels. It would seem to be a rank injustice to compel a public utility to make an investment and then, afer the investment is made, hold that, although the public compelled the utility to make the investment when prices were high, prices having fallen, the utility is entitled to earn a return only upon the present cost of labor and material. Utilities must grow and expand with the needs of the public. They have very little if any option in regard to the matter.

6th. If a public utility which has during a twenty-year period earned and distributed a reasonable return upon the investment value of its property is permitted to increase its rates by reason of the fact that labor and materials have advanced in price in the open market, the earnings derived from such increase in rates will constitute an addition to its prior earnings and the utility will thus be permitted to earn more than a reasonable rate upon its investment. The increased earnings may be capitalized in one form or another, and investments in public utilities will then have a speculative element and be deprived of the stability which they have hitherto enjoyed. If the increased earning power is capitalized, the increased capitalization will constitute a perpetual fixed charge as against the public.

7th. The materials—brick, stone, copper, etc.—which enter into the construction of the plant of a public utility lose their identity as such and become a part of a new whole and must be valued as such. It does not seem reasonable to say that the value of a cast-iron pipe in a water main rises and falls in value with market fluctuations of pipe which is offered for sale in the open market. After material is incorporated into a public utility plant its value must be determined as a plant, not as material not so incorporated.

For these reasons we consider that no great weight is to be attached to cost of reproduction new less depreciation under present conditions, and particularly so under the conditions that prevailed in 1921.

The utility in this case having under the laws of the state of Wisconsin consented that the municipality in which it is situated may at any time take its property wheresoever situated, actually used and useful for the convenience of the public, and that in consideration thereof the municipality shall pay to it "just compensation," we are led to inquire what constitutes just compensation.

In *Oshkosh W. W. Co. v. Railroad Comm.* 161 Wis. 122 (152 N. W. 859), at p. 127, it is said:

"In the proper valuation of a public utility for condemnation or sale purposes certain main elements usually present in every case may legitimately be considered. These are the present value of its physical property; the present and prospective reasonable earnings of its business; the going value thereof; and the amount of money presently needed to put the plant in good condition. There may be other elements, but these are generally the essential ones. In determining the value of the physical property due regard should be had to the original cost thereof; the reproduction cost; the amount of depreciation; and the amount of obsolescence. The going value of a utility is that part of its value due to its having an existing established business. In fixing its amount the actual cost of establishing the utility in question as modified by what under all the circumstances ought to have been its reasonable cost, as well as the reasonable cost of establishing like enterprises under similar conditions, may be considered."

Just compensation therefore means the fair and reasonable value of the property taken at the time possession is acquired, which is to be arrived at in the exercise of a sound and competent business judgment upon the various elements of value, considering the property as a going business entity. *Appleton W. W. Co. v. Railroad Comm.* 154 Wis. 121, 142 N. W. 476.

While under the public utilities act the utility has consented that the public may take its property at the just compensation fixed by the *Railroad Commission,* this does not

imply the right on the part of the public to establish a confiscatory rate. *Stanislaus Co. v. San Joaquin & K. R. C. & I. Co.* 192 U. S. 201, 24 Sup. Ct. 241.

But the utility having accepted the provisions of the act, the determination by the *Commission* of the amount that constitutes just compensation is given added weight because it is the price at which the public has a perpetual right to purchase the property.

It is the theory of our law that investments in the public utility field should be under the control and supervision of the *Railroad Commission.* The utility must apply there for leave to purchase additional properties, for permission to issue its securities, for a permit to improve its water power if it owns one, to establish or revise its rates, and it is subject to supervision in many other respects. We conceive that it was one of the fundamental objects of the public utility act to stabilize investments in public utility property, in the interest of the public primarily, and secondarily in the interest of the investor, so that the public would not be subjected to the hazards and exactions of a speculative enterprise in a field where it undertook to furnish a monopoly. The rates were to be just and reasonable. If the public wishes to purchase the property, it must pay just compensation therefor.

Under our statute it may well be argued that with increasing prices, increasing interest levels, and increasing cost of operation, the utility investor is in justice entitled to a larger return than formerly; but this argument is more properly urged to secure an increase in the rate of return rather than in the rate base upon which the return is to be computed. For fifteen years this statute has been administered upon the theory that the investor was entitled to a reasonable return on a valuation that fairly represents the legitimate and necessary cost of constructing the plant and building up its business. *Hill v. Antigo W. Co.* 3 Wis. R. R. Comm. Rep. 623.

Reference is made to *Hill v. Antigo W. Co.* for a full discussion of the subject, the substance of which we approve.

Both the *Commission* and the court in Wisconsin have adhered with reasonable fidelity to what is now termed the prudent-investment theory, that is, that the utility is entitled to earn a reasonable return upon the amount which has been prudently invested in the enterprise. This does not require the public to pay rates which will yield a return upon unreasonably high costs of construction, excessive bond discounts, large promoters' fees, abnormally high prices of labor and material, lack of proper engineering investigation, poor management, and other conditions of like character. However, the question of whether or not the investment was prudent must be determined as of the time when it was made. It may not be possible to avoid adverse conditions and the utility may be entitled to justify charges which at the time the matter is under investigation seem large.

As was said in *Hill v. Antigo W. Co., supra:*

"The utility, for instance, may have been badly needed at the time it was constructed, so badly needed, in fact, that its construction could not safely have been postponed to a more convenient time. The municipality may not have been in position to undertake this work on its own account, or on any better terms. No private party may have been willing or able to assume the work on conditions that were any more favorable. Under such conditions it might not always be fair or equitable for the municipality, later on when the situation has improved, to take any undue advantage of those who in good faith undertook to furnish a service that was almost indispensable, and that at the time could be had on no better terms."

Mr. Hughes, former Justice of the supreme court of the United States, acting as referee in *Brooklyn Borough Gas Co. v. Public Service Comm.* 1918F Pub. Util. Rep. 335, at p. 347, after speaking of cost of operation, said:

"But it is a different thing, after cost has been defrayed,

and the question is as to the compensation to be allowed in excess of cost [of operation], to take as the basis for a compensatory return an asserted plant value, far above the actual investment, which is reached merely by expert estimates of a cost of reproduction under abnormal conditions. This would result in allowing a public-service corporation to take advantage of a public calamity by increasing its rates above what would be a liberal return not only on actual investment, but upon a normal reproduction cost, in the view that unless it could make an essentially exorbitant demand upon the public it would be deprived of its property without due process of law. The enforcement of the constitutional guaranty does not require the application of any artificial formula. It has constantly been pointed out that the rate base must be what is called 'the fair value of the property,' and that as to this there must be a reasonable judgment based on a proper consideration of all relevant facts." (Cases cited.)

See, also, *U. S. v. Boston, C. C. & N. Y. C. Co.* 271 Fed. 877.

In determining the present fair value of a public utility operating under our public utility law, it is our view that justice as well as sound economic practice requires that controlling weight should be given in the valuation of the plant of a public utility to the investment cost where the investment has been prudently made. In determining the present fair value of the property of a public utility for rate-making purposes, but little if any weight can be given to capitalization of earnings or to stock and bond values for the reason that these are dependent almost entirely upon the rates charged, the reasonableness of which is the very subject under investigation. If the rates charged be unreasonably low, the value of the property upon that basis would be depressed. If they be unreasonably high, it would be inflated. *Minnesota Rate Cases,* 230 U. S. 352, 455, 33 Sup. Ct. 729; Whitten, Valuation of Public Service Corporations, §§ 100, 1014.

We shall now consider in the light of the principles stated

the present fair value of the plaintiff's plant.   The situation
is fairly presented by the following table:

| Year. | Additions since last year. | Fair value June 30. |
|-------|---------------------------|---------------------|
| 1913 |           | $156,800 |
| 1914 | $54,181 | 210,981 |
| 1915 | 14,093 | 225,074 |
| 1916 | 31,495 | 256,569 |
| 1917 | 48,000 | 304,569 |
| 1918 | 63,602 | 368,171 |
| 1919 | 33,827 | 401,998 |
| 1920 | 22,870 | 424,868 |

From this table it appears that out of the total 1920 value
of $424,868, $268,068, or a little over sixty-three per cent.,
consists of additions made during the years 1913 to 1920.
The additions made during the years 1917, 1918, 1919, and
1920 (the extremely high-price period) amount to $168,299.
These additions alone exceed the value of the plant as of
June 30, 1913.   These valuations represent with substantial
accuracy the actual amount invested both in the low-price
and the high-price periods.   Mr. Hagenah, plaintiff's en-
gineer, contended that the rate base should be $594,904.
His valuation is the cost of reproduction new less accrued
depreciation based upon the average prices of the five-year
period of 1915 to 1919, inclusive, to which is added, as
heretofore stated, a sum for working capital and going-
concern value.   He admitted that, had he used a ten-year
average price, he would have arrived at a valuation perhaps
twenty-five per cent. lower than the valuation actually made.
Upon that basis his valuation of the physical property before
adding working capital and going-concern value, instead of
being $497,504, would have been in the neighborhood of
$375,000, which compares very closely with the value fixed
by the *Commission* upon the purely physical property in
arriving at its rate base.   Cost of reproduction new is at its
best under normal conditions a check rather than a measure
of present fair value.

We should scrutinize with great care a determination which found the present fair value of the physical property of a utility plant in this state to be less than its actual cost, providing the investment had been prudently made, and we should scrutinize with even greater care a finding which would impose upon the public a schedule of rates which would earn a reasonable return upon $170,000 which the utility never invested.

We are of the opinion that giving due weight to the actual cost of the plant, to its cost of reproduction new less depreciation, and the proper allowance for working capital and going-concern value, and other factors, a schedule of rates which will earn a reasonable return upon $424,868 cannot be said to be unjust and unreasonable. There is no hint or claim in this case that the investment by the utility was in any way imprudent or unwise. In the absence of satisfactory proof to the contrary it must be presumed that the investment was prudently made.

While a more generous allowance for going-concern value and working capital would have been fully warranted, we cannot say that the amount allowed is so small that, when combined with the value of the physical plant, the whole is to be condemned under the Fourteenth amendment. Nor do we wish to be understood as saying that the actual cost of the physical plant of a public utility, even when the investment is prudently made, should be absolutely controlling.

We shall not attempt to deduce a formula. If, however, we were to accord rank to the various factors in accordance with the weight which is to be given to each in determining present fair value for the purpose of establishing a rate base, it would be as follows:

(1) Actual cost of the plant when the investment has been prudently made.

(2) Under normal conditions, cost of reproduction new less depreciation. (When conditions are abnormal, cost of reproduction new less depreciation should be fourth.)

(3)  Going-concern value.

(4)  Working capital.

(5)  Other elements of value which may be presented in a particular case.

It must be understood that throughout this discussion we have assumed that earnings should include a sum sufficient to cover depreciation and obsolescence.  Reference must be had in each case to these factors and they must be treated with due regard to the rights of the public as well as the investor.  We have not discussed these factors in this case because no question is raised in regard to them except as applicable to cost of reproduction new.  In our view, discussion of these factors in this connection is not pertinent in this case, particularly in the light of recent decisions of the supreme court of the United States, where it repeatedly stated that it is cost of reproduction new less depreciation that is to be given consideration.

In the present case it is apparent that if the additions to the plant made at peak prices be depreciated to the price level of 1921, and the amount of the depreciation be added to the plant as of June 30, 1913, ample allowance is made for the appreciation of that part of the plant acquired prior to 1913 by reason of the increased price level.  This upon any tenable theory.

It appears from the evidence that during the latter part of the year 1920 the plaintiff failed to earn its operating expenses and a proper depreciation charge.  It appears that this situation was due almost entirely to the inability of the plaintiff to secure Eastern coal; that its equipment was not adapted to the use of Illinois and Indiana coal, resulting in an increase of seventy-six per cent. in the cost of producing steam.  At the time the decision of the *Commission* was announced the situation had been remedied, the plaintiff was again receiving Eastern coal, and there was every prospect that the conditions which existed in the latter part of 1920 and the early part of 1921 would no longer obtain.  This

Waukesha Gas & E. Co. v. Railroad Comm. 181 Wis. 281.

departure from normal conditions is one of the hazards of the business, and controlling weight cannot be attached to a condition which was not only abnormal but temporary, due in the main to the miners' strike in the fall of 1919 and the switchmen's strike in the spring of 1920.

It should be borne in mind that we have here discussed the present fair value of the property of the utility for the purpose of establishing a rate base, no other question being presented by the record. We do not consider questions of administrative policy. As pointed out, these matters belong in the field of administrative law. In the effort to find the just and reasonable rate which it is its duty under the statute to determine, the *Railroad Commission* may and should consider many factors which do not enter into the question presented to the court. Having sole regard for the public interest, it may appear to the *Railroad Commission* as a matter of policy that the rate should be large enough to earn a return which will attract capital to the utility field; which will readily permit of expansion and extension of the utility service and keep it in a high state of efficiency; which will attract to the utility field the best type of sound, economical, aggressive managerial ability, and in other ways stimulate productive activity which will be for the benefit of the public and incidentally for the benefit of the investor. Capital is not attracted to an enterprise which must constantly travel near the financial dead line which divides prosperity from bankruptcy. The creative genius of managers is not stimulated by deficits. All these and many other considerations relate to matters of policy not within the judicial field. As has been pointed out, it is the duty of the *Commission* to declare what is a just and reasonable rate, considering not only the legal rights of the parties, but, within the field prescribed by the legislature, the broader questions of public policy which are necessarily involved. It is the duty of the court to determine without regard to questions of policy whether or not the rates when

established permit the utility to earn a reasonable return upon the present fair value of its plant. The problems are entirely different.

It is true that matters of policy are reflected in the rate rather than the rate base. We call attention to them in this connection in order that it may appear that we have not overlooked these elements in the problem which in the mind of the economist loom so large. It is be regretted that more discrimination has not been used in attempting to extend the rules laid down by courts for the determination of questions in the judicial field into the administrative field, where many matters may properly be given consideration which can have no weight in the judicial field. It is apparent that the lowest possible rate that will pass the constitutional test is not the just and reasonable rate the statute prescribes.

That part of the order of the circuit court remanding the record, so far as it relates to the heating utility, to the *Commission* for further consideration, must be affirmed. The trial court remanded the record to the *Commission* for further proceedings in accordance with the statute. This was not error.

*By the Court.*—Judgment of the circuit court is affirmed.

The following opinion was filed July 25, 1923:

JONES, J. (*dissenting*). I shall briefly state my reasons for dissenting from the opinion of the court.

It is claimed by counsel for the plaintiff that the rates established by the *Commission* and approved by the order of the circuit court are confiscatory. If this claim is sustained by the proof, the order fixing the rates was void as depriving plaintiff of property without due process of law. Then a federal question is presented, in the determination of which the decisions of the United States supreme court should be followed.

It is stated in the opinion of the majority, "The real con-

troversy in this case arises from the fact that the *Commission* allowed no accretion in value for that part of the electrical plant acquired by the utility prior to June 30, 1913."

The opinions and findings of the *Commission* show that they adopted a value which had been determined in 1913, and added to that value the actual cost of subsequent additions.

No claim was made that the original or the later investment was not prudently made. It seems to me to be demonstrated from the finding of the *Commission* that they rejected the view that reproduction cost should be considered, and adopted what is generally called the prudent-investment theory.

It was stated in the opinion of the *Commission,* "No further apportionment of the property than that indicated by the 1913 valuation and by the book additions was attempted."

Ever since the decision in *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. 418 (1898), it has been the rule in that court that the present as compared with the original cost of construction is a matter for consideration, and is to be given such weight as may be just and right in each case. It is unnecessary here to review the numerous decisions applying this rule, since it has been very recently declared in several cases.

The question now involved was considered in *State ex rel. Southwestern Bell Tel. Co. v. Public Service Comm.* (U. S.) 43 Sup. Ct. 544. As in the present case, there had been a previous valuation, to which the commission added the amount of the investment during a period of high prices. The court said:

"Obviously, the commission undertook to value the property without according any weight to the greatly enhanced costs of material, labor, supplies, etc., over those prevailing in 1913, 1914, and 1916. As matter of common knowledge, these increases were large. Competent witnesses estimated them as forty-five to fifty per centum. . . .

"It is impossible to ascertain what will amount to a fair return upon properties devoted to public service without giving consideration to the cost of labor, supplies, etc., at the time the investigation is made.  An honest and intelligent forecast of probable future values made upon a view of all the relevant circumstances is essential.  If the highly important element of present costs is wholly disregarded, such a forecast becomes impossible.  Estimates for tomorrow cannot ignore prices of today."

This case was decided after the order of the *Railroad Commission of Wisconsin* now under consideration and the order of affirmance by the circuit court, two of the Justices dissenting.

In a still later opinion, rendered June 11, 1923, in *Bluefield W. W. & I. Co. v. Public Service Comm.* (U. S.) 43 Sup. Ct. 675, the same question arose, and the court said:

"The record clearly shows that the commission in arriving at its final figure did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous. *State ex rel. Southwestern Bell Tel. Co. v. Public Service Comm.* 43 Sup. Ct. 544, decided May 21, 1923.  Plaintiff in error is entitled under the due-process clause of the Fourteenth amendment to the independent judgment of the court as to both law and facts.  *Ohio Valley W. Co. v. Ben Avon Borough*, 253 U. S. 287, 289, 40 Sup. Ct. 527, and cases cited."

"It is clear that the court also failed to give proper consideration to the higher cost of construction in 1920 over that in 1915 and before the war, and failed to give weight to cost of reproduction less depreciation on the basis of 1920 prices, or to the testimony of the company's valuation engineer, based on present and past costs of construction, that the property, in his opinion, was worth $900,000.  The final figure, $460,000, was arrived at substantially on the basis of actual cost less depreciation plus ten per cent. for going value and $10,000 for working capital.  This resulted in a

valuation considerably and materially less than would have been reached by a fair and just consideration of all the facts. The valuation cannot be sustained. Other objections to the valuation need not be considered."

In this opinion all the Justices concurred.

In another case in which the opinion was rendered the same date, *Georgia R. & P. Co. v. Railroad Comm.* (U. S.) 43 Sup. Ct. 680, the claim was made by the utility that the property should have been valued at its replacement cost in a time of high prices. The court refused to adopt this view, and held that a reasonable judgment as to the present fair value required some consideration of reproduction costs, but that present fair value is not synonymous with present replacement cost. One hundred twenty-five thousand dollars was allowed by the commission to represent appreciation in land value.

It was expressly stated that the question on which the court was divided in the *Southwestern Bell Tel. Co. Case, supra,* was not involved.

In this court the cost of reproduction has hitherto been treated as one of the necessary elements to be considered in arriving at the true value of public utilities. *Appleton W. W. Co. v. Railroad Comm.* 154 Wis. 121, 142 N. W. 476; *Oshkosh W. W. Co. v. Railroad Comm.* 161 Wis. 122, 152 N. W. 859; *Duluth St. R. Co. v. Railroad Comm.* 161 Wis. 245, 152 N. W. 887.

It has sometimes been claimed that reproduction cost new less depreciation should be the dominant and controlling element in the investigation. Although the decisions of this court and the federal courts have rejected this view, they have uniformly held that it is a factor to be considered.

I cannot agree that the right of purchase by the public is entitled to great weight in determining the present fair value of the property. Under the indeterminate permit the city had no right of purchase except by paying the fair present

value, to be determined according to methods which must be presumed to be fair and just.   In a large proportion of the public utilities which have come into existence during recent years, this right of purchase by the municipality is recognized; but it seems to me that when the public seeks to acquire the property, the value thereof is not to be depreciated by the mere fact that the public has the right to buy for the full value.   It seems very clear that the value of the property is not depreciated by the fact that the public utility is given by the statute a monopoly until it is established that public convenience and necessity require a second utility.

It is said in the majority opinion that in the decision of the United States supreme court the degree of weight to be given to the cost of reproduction is not stated.   This is true, but it would be hardly practicable for the courts to define or specify the exact weight to be attached either to original cost or to the cost of reproduction, as neither of these elements, according to the prevailing rule, is an absolute guide.

The error in the orders of the *Commission,* as I understand them, is that no weight whatever was given to the cost of reproduction new less depreciation.

I do not consider that this case is distinguishable from the well settled rule declared in the decisions of the federal court above referred to, and for that reason I cannot concur.