WISCONSIN STATE TELEPHONE ASSOCIATION, a Wisconsin non-stock corporation, Petitioner-Appellant,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Respondent.

Court of Appeals

*No. 94–0458. Submitted on briefs November 8, 1994.—Decided April 25, 1996.*

(Also reported in 549 N.W.2d 278.)

762

For the petitioner-appellant the cause was submitted on the briefs of *William C. Williams* of *Bell, Metzner, Gierhart & Moore, S.C.* of Madison.

For the respondent-respondent the cause was submitted on the brief of *Natalie G. Crosetto* of the Public Service Commission of Wisconsin.

Amicus curiae brief was filed by *Larry J. Martin* and *Erica M. Eisinger* of *Quarles & Brady,* Madison, and *Nancy H. Wittebort* of AT&T, Chicago for AT&T Communications of Wisconsin, Inc.

Before Eich, C.J., Dykman and Sundby, JJ.

SUNDBY, J. The Wisconsin State Telephone Association (WSTA), a trade association of local exchange carriers, appeals from an order affirming in part an order of the Public Service Commission entered in Docket No. 05-TR-103 March 23, 1993. The order

.was entered to effect the Commission's findings and conclusions resulting from its investigation of intrastate access costs and intrastate access charges. We affirm the order in part and reverse in part.

## BACKGROUND

An access charge[1] is paid by an interexchange carrier (IXC) to a local exchange carrier (LEC)[2] for services and facilities supplied by the LEC to an IXC to complete and bill for telephone calls carried by the IXC. Prior to the breakup of the Bell System January 1, 1984, access charges did not exist. AT&T reimbursed LECs for the cost of providing what are today called access services according to a Federal Communications Commission (FCC) costing methodology. After divestiture and with the beginning of interstate competition, the FCC developed a system of interstate access charges. The Public Service Commission ordered Wisconsin LECs to set intrastate access rates which "mirrored" interstate rates. Since that time, the Commission and the telecommunications industry have struggled to move away from "mirrored" rates to Wisconsin-based costs. The Commission considered these Wisconsin-based charges experimental and created a Task Force to examine access charges and advise the Commission on policy changes. The Task Force reported in October 1990. The Commission adopted major parts of the report but rejected a

---

[1] "Access charges" are payments which long distance carriers make for the use of local phone companies' exchange plants for originating and terminating calls. Public Service Commission, Docket No. 05-TR-103, *Report of the Access Charge Task Force* 1 (October 1990).

[2] The Commission also refers to LECs as local telephone companies or independent companies (ICOs).

proposed reduction in access rates except as an "interim" solution.

The Commission held hearings on the Task Force's recommendations and issued interim orders. The parties agreed that the then-current access rates had to be reduced. Access rates had to be brought closer to economic costs. The parties also agreed that the price of long distance telephone service had to be equalized statewide, *i.e.*, geographically averaged. The Commission rejected "generic" access rates in favor of company-specific rates, set in rate proceedings.

In Docket No. 05-TR-103, the Commission set a series of "benchmark" access rates, toward which the Commission expected all LECs to move. The Commission did not, however, set benchmark rates for billing and collection.

The LECs or ICOs have two main sources of revenue: access charges and local service rates. In a previous docket, 05-TR-102, the Commission approved a support fund to ameliorate "rate shock" caused by the move to company-specific access rates (except for carrier common line charges (CCLC)).[3] In previous orders in this Docket, 05-TR-103, the Commission approved four support funds as part of an interim solution. However, the Commission approved funding for only two of the funds, called High Cost Funds, and

---

[3] The Task Force commented on Docket No. 05-TR-102 as follows:

> [T]he Commission allowed companies who would be financially harmed by changing to cost-based access charges to make up at least a portion of the revenue loss through local rate increases. In order to cushion the rate shock, the companies were allowed to increase rates gradually, while recovering any shortfall from a transition shortfall fund.

*Access Charge Task Force* at 6.

the remaining two were eliminated. It directed the Task Force to develop proposals for the funding and administration of the funds. In its second report, October 1991, the Task Force made its recommendations. The two remaining funds (the Wisconsin Support Fund and the NTS Transition Fund) were combined into a fund called the Intrastate Universal Service Fund (IUSF), administered by WSTA.

However, to minimize the financial distress for some LECs caused by the withdrawal of the High Cost Funds support, the Commission ordered that the funds be phased out in three equal steps ending January 1, 1995. It is the phasing out of these funds which WSTA claims was beyond the Commission's authority. WSTA argues that by eliminating these funds the Commission eliminated a rate, toll or charge not subject to the Commission's regulatory authority because of the partial deregulation of small telecommunication utilities (STUs).[4] In the Commission's third interim order in this docket, each LEC whose access costs exceeded access revenue was directed by the Commission to show how much support

---

[4] A "[s]mall telecommunications utility" was defined as: "[A]ny telecommunications utility or a successor in interest of a telecommunications utility that provided landline local and access telecommunications service as of January 1, 1984, and that has less than 9,000 access lines in use in this state." Section 196.01(8), STATS., 1991-92. What the legislature did next was peculiar. By § 1 of 1993 Wis. Act 121, the legislature amended the definition of STUs to increase the number of lines to 50,000; however, by § 2 of the same act, the legislature decreased the number of lines back to 9,000. It appears that the legislature "dropped [a] stitch." *See Scharping v. Johnson*, 32 Wis. 2d 383, 393 n.6, 145 N.W.2d 691, 697 (1966).

it would receive from the High Cost Funds. WSTA argues that the elimination or reduction of those funds affected the utilities' tariffs and was therefore not subject to the Commission's regulatory authority.

WSTA also attacks that part of the Commission's order which required LECs to file tariffs eliminating language allowing only certain service providers and carriers to purchase access services. WSTA argues that the Commission has no statutory authority to make that requirement.

## STANDARD OF REVIEW

Our standard of review is mixed. We owe no deference to the Commission's construction of its own authority under ch. 196, STATS. *See Madison Metro. School Dist. v. DPI*, 199 Wis. 2d 1, 8, 543 N.W.2d 843, 846 (Ct. App. 1995). As to WSTA's constitutional claims, we are bound by the Commission's findings of fact if they are supported by credible evidence. *See Schaefer v. Northern Assur. Co.*, 182 Wis. 2d 148, 164, 513 N.W.2d 615, 622 (Ct. App. 1994) (citing § 805.17(2), STATS.). However, whether those facts establish a "taking" or violate WSTA's right to due process are questions of law which we decide without deference to the Commission. *See State v. Verstoppen*, 185 Wis. 2d 728, 736, 519 N.W.2d 653, 656 (Ct. App. 1994). Finally, we accord to the Commission's decisions and findings which implicate its experience, technical competence, and special knowledge "great weight." *Sieger v. Wisconsin Personnel Comm'n*, 181 Wis. 2d 845, 855, 512 N.W.2d 220, 223 (Ct. App. 1994).

## DECISION

(a) *Affect of Deregulation.*

STUs were partially deregulated by 1985 Wis. Act 297. The Act exempted STUs from prior Commission review and approval of rates for telecommunications services and the types of services which they could offer customers. *Wisconsin's New Law Authorizing Partial Deregulation of Telecommunications Services*, Legislative Council Staff Memorandum 86-11, at 9 (May 7, 1986). The STUs could be made subject to the Commission's authority if certain rate conditions existed or upon petition of a percentage of customers. *Id.* The deregulation of STUs was further affected by 1989 Wis. Act 344.

The Commission does not dispute the need for "high-cost" funding for both companies and customers "to preserve universal service." It argues, however, that support funds are not payments for services but subsidies. We agree. The need for support funding arose from structural changes in the industry and not from new services. WSTA argues that this subsidy is part of a STU tariff because if that funding is withdrawn, the STUs will be required to raise their rates to make up for the revenue shortfall. That may well be the effect of the phasing out of the High Cost Funds, but that is what deregulation is all about.

In any event, the Commission's order protected LE Cs who may have experienced financial hardship because of the loss of support funds. The order permitted a LEC to suspend reduction in its support funding by filing a rate case under § 196.20, STATS.

The Commission's order requires that the IUSF which replaces the phased-out High Cost Funds will be financed by a per-minute surcharge on terminating C

768

CLC rates paid by LEC toll providers. This terminating CCLC surcharge does not apply to calls carried by a LEC toll provider which terminate in its own exchange. Instead, WSTA monthly assesses each LEC toll provider an amount equal to the revenue it would have collected if it had imposed CCLC surcharges on minutes of use. Under the order in this docket, WSTA files a tariff including the CCLC surcharge, and the ICO files a concurrence in its tariff. WSTA, as fund administrator, may revise the surcharge as necessary.

The Commission's order provides in part: "All LEC toll providers shall file tariffs containing language concurring with the WSTA CCLC surcharge by May 1, 1993." The Commission's findings of fact state: "LEC toll providers and the ICOs should file tariffs incorporating such [surcharge] language by May 1, 1993." WSTA asks: "Does the Public Service Commission . . . have the authority to require small telecommunications utilities to alter their tariffs?" We do not read WSTA's briefs to attack that part of the Commission's order requiring all LEC toll providers to file tariffs containing language concurring in the WSTA CCLC surcharge. WSTA's attacks are directed at the Commission's alteration of the LECs' tariffs by eliminating the High Cost Funds and the tariff language allowing only certain service providers and carriers to purchase access services from the access tariff. *See* Findings of Fact, Conclusions of Law and Final Order, PSCW Docket No. 05-TR-103, at 40 (March 23, 1993).

We have held that the High Cost Funds were not payments for service but were subsidies which the Commission was not required to continue. Elimination of those subsidies did not constitute regulation of the I

COs' rates, charges and tolls. We conclude, however, that the Commission had no statutory authority to require an ICO meeting the definition of a STU to alter its tariff to require it to allow all classes of customers to purchase access services.

The Commission argues that it has statutory authority to regulate the terms and conditions of STU access tariffs and to order to whom STUs must offer their access services. It contends that such authority is consistent with the intent of the legislature expressed in § 1, 1985 Wis. Act 297, that universal telecommunications services shall continue to be available to the people of this state at just and reasonable rates and of sufficient quantity, quality and reliability to meet the public interest. However, the Commission overlooks its own agreement with the telecommunications industry as to the scope of the partial deregulation of STUs. In the drafting record of 1989 Wis. Act 344, the telecommunications industry and the Commission agreed to the following intent section: "It is the intent of the Legislature to give small telecommunications utilities greater flexibility and to reduce the regulatory burdens, costs, and delays by permitting those companies to establish their rates for service, depreciation . . ., profit sharing and classifications without commission review, investigation and approval." Drafting record, Appendix 1 (small telecommunications utilities regulation intent section).

The Commission also argues that it has authority under § 196.60(3), STATS., to seek forfeitures from any STU guilty of discriminating in the provision of service to any person. Section 196.60(3) is enforceable by a court, not the Commission. Further, the Commission has not attempted to impose a forfeiture against a STU

under this statute. It also claims that it can place a STU under full regulation for a violation of § 196.60. Its argument is premature; it has not determined that a STU has violated § 196.60. Finally, it cites a number of statutes which it argues show that WSTA's position as to deregulation doesn't make sense. In its appearance before the legislature in support of the bill which became 1989 Wis. Act 344, the Commission supported the concept of partial deregulation of STUs. Drafting Record, Testimony of Executive Assistant to the Chairman of the Public Service Commission (Feb. 22, 1989). The Commission now appears to wish to return to full regulation of STUs. We reject its argument which fails to give effect to the intent of the legislation to partially deregulate STUs.

(b) *WSTA's Constitutional Claims.*

1. Inadequate Rates.

WSTA argues that the Commission's phasing out of the High Cost Funds without determining the impact on each company affected is confiscatory. It contends that the Commission could withdraw such support funding only on a case by-case basis. WSTA argues that the result may be that some rates are so insufficient as to be confiscatory, citing *Waukesha Gas & Electric Co. v. Railroad Comm'n*, 181 Wis. 281, 194 N.W. 846 (1923).

The Commission addresses WSTA's past practice argument but does not address its constitutional arguments. AT&T, in its nonparty brief, does address those arguments. It correctly notes that WSTA's claim is speculative. WSTA does not present any evidence that because of the phasing out of the High Cost Funds,

771

any LEC will be unable to earn a fair rate of return. Further, the Commission provided a safety valve when it permitted a LEC to suspend the reduction in support funding by filing a rate case under § 196.20, STATS. PS CW Findings of Fact at 27. A constitutional taking does not occur as long as the property owner has a remedy to avoid the taking. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987).

As to WSTA's past practice argument, we find no precedent binding the Commission to deal in a certain way with the enormous regulatory problems caused by divestiture.

 2. Due Process.

WSTA argues that the Commission's elimination of the High Cost Funds "raises due process concerns," citing *Mid-Plains Telephone v. Public Serv.Comm'n*, 56 Wis. 2d 780, 202 N.W.2d 907 (1973). It is not clear whether WSTA's concerns are lack of procedural due process or deprivation of substantive due process. However, it argues that the Commission's procedures result in confiscatory rates and are thus arbitrary and capricious. WSTA's claim is that the Commission could not do to LECs what it did; therefore, its concern is that some LECs may have been denied substantive due process. *See Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990). This claim is merely a restatement of its taking claim and fails for the same reasons its taking claim failed.

(c) *Universal Service Programs.*

The Commission ordered all LECs to establish universal service programs—lifeline, link-up and early intervention. It argues that § 196.395, STATS., empowered it to make that order. While WSTA does not contend that the Commission could not order the LECs to establish universal service programs, it asks that we disabuse the Commission of the notion that § 196.395 gives it authority to take some actions by a conditional order which it cannot take by a direct order. We decline the invitation because we would be giving an advisory opinion. *See Brown v. LaChance*, 165 Wis. 2d 52, 58, 477 N.W.2d 296, 299 (Ct. App. 1991). The Commission has not made a conditional order which WSTA contests.

*By the Court.*—Order affirmed in part and reversed in part.