PABST CORPORATION and others, Appellants, vs. RAILROAD COMMISSION OF WISCONSIN and others, Respondents.

*September 12—October 8, 1929.*

For the appellants there were briefs by *Lines, Spooner & Quarles, Gold & McCann,* and *Lamfrom, Tighe, Engelhord & Peck,* attorneys, and *Charles B. Quarles* and *Morris*

*Karon,* of counsel, all of Milwaukee; and the cause was argued orally by *Charles B. Quarles, Morris Karon, Walter L. Gold,* and *Leon B. Lamfrom.*

For the respondents there was a brief by the *Attorney General* and *J. E. Messerschmidt,* assistant attorney general, attorneys for the Railroad Commission, and *John M. Niven,* city attorney of Milwaukee, and *Clifton Williams,* special assistant city attorney, and oral argument by *Mr. Williams.*

FRITZ, J. Plaintiffs' principal contentions are that the rate schedule permits the city to earn an excessive return on the reasonable valuation of its water plant, and that the rate is inequitable, unreasonable, and unjustly discriminatory against large users of water.

The respective functions and powers of the Railroad Commission and of the courts, in relation to the establishment of rates for public utility service, were thoroughly considered and well defined in *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 116 N. W. 905, and *Waukesha Gas & E. Co. v. Railroad Comm.* 181 Wis. 281, 194 N. W. 846. During the course of the opinion in the latter case this court said:

"It may as well be said here as anywhere that the courts approach the question of whether or not a rate is reasonable from an entirely different standpoint than does the commission." (Page 287.)

"It is the duty of the commission to prevent unreasonable exactions by the utility on the one hand, and also to protect the rights of investors from confiscation by imposition of rates which are too low on the other. The rate should be, in the language of the statute, 'just and reasonable;' in other words, not so low as to approach the line of confiscation nor so high as to be unjust and oppressive. A just and reasonable rate need not approach either line."

"Under the present utility law we have nothing to do with the intricacies of rate-making, with questions of management, and other factors which may operate to increase or

.diminish the revenues under the established rate." (Page 288.)

"Having regard to the statute solely, it is apparent that the determination of the commission cannot be disturbed unless it shall be made to appear to the court by clear and satisfactory evidence that the rate established by it is either unreasonably low or unreasonably high. The court is not called upon to substitute its judgment for that of the commission as to what the rate should be. In building up the rate the commission must necessarily consider not only the legal rights of the parties, but, as has been pointed out, matters of public policy, and must give weight to the various factors entering into the problem. The court cannot disturb the finding of the commission unless it can say that the established rate has no basis in reason. It is manifest, therefore, that there is a zone within which the determination of the commission cannot be disturbed. This does not mean that the Railroad Commission has power to choose as a matter of policy between the different rates, but that if in the exercise of its judgment in ascertaining the just and reasonable rate the result reached is within the zone of reasonableness, it must be judicially approved." (Page 290.)

In the case at bar the proof established, and the commission found,—after making proper additions for the going-concern value, and proper deductions for depreciation and obsolescence and for costs of parts of the distribution system which had been paid directly out of special assessments against property owners,—that on January 1, 1925, the net book cost of the city's water plant was $15,496,252, and that the cost of reproduction would be $33,000,000. In its decision and order, dated December 29, 1926, the commission adopted a valuation of $17,000,000 as a basis for rates. In fixing that value at but $17,000,000, although the reproduction cost would be $33,000,000, the commission said: "We see no reason for making an allowance in this case for appreciation due to present-day prices beyond any that has been made in previous cases."

Shortly after the commission filed that decision, this court in *Waukesha Gas & E. Co. v. Railroad Comm.* 191 Wis. 565, 569, 211 N. W. 760, modified its expressions in the earlier case of *Waukesha Gas & E. Co. v. Railroad Comm.* 181 Wis. 281, 194 N. W. 846, but did not intend to withdraw what was said in that case any farther than was necessary to conform to the federal rule announced in *McCardle v. Indianapolis W. Co.* 272 U. S. 400, 47 Sup. Ct. 144. So far as the conclusion in *Waukesha Gas & E. Co. v. Railroad Comm.* 181 Wis. 281, 194 N. W. 846, was out of harmony with that federal rule, it was modified; otherwise the conclusions reached in that case stand. The federal rule requires that the commission, in ascertaining the present value, shall give due consideration to the present-day cost of construction. It does not require that the value so fixed shall be, or even substantially agree with, the reproduction cost less depreciation, or that the reproduction cost shall be the controlling factor. It does not mean that either the original cost, or the present cost, or some figure arbitrarily chosen between those two, is to be adopted as the value. But it does prescribe that:

"To ascertain value, 'the present as compared with the original cost of construction' are, among other things, matters for consideration. . . . The weight to be given to such cost figures and other items or classes of evidence is to be determined in the light of the facts of the case in hand." *McCardle v. Indianapolis W. Co., supra,* p. 410. To the same effect see *St. Louis & O'Fallon R. Co. v. U. S.* 279 U. S. 461, 484, 49 Sup. Ct. 384, and cases cited there.

Manifestly the commission, in adopting $17,000,000 as the rate base, did not give due consideration to the reproduction cost. If the commission had applied the federal rule, its valuation, probably, would have been considerably higher than $17,000,000.

However, having adopted $17,000,000 as the rate base, the commission found, and we think properly, that the city

was fairly and reasonably entitled to a return of eight per cent. The water-supply business is probably the most essential and beneficent of public utility services. The promotion of sanitation and health, and the very existence of an enormous urban population, are dependent upon the constant and reliable supply of wholesome water in abundance. The margin of profit should not be merely sufficient to provide as fair and reasonable a return as is considered proper for other public utilities, but should at all times be ample to inspire and facilitate the continued development and improvement of the plant and the efficiency of the service, so that the quality and abundance of the supply will always be well in advance of the actual needs of the community.

An eight per cent. return, upon the rate base of $17,000,000, requires $1,360,000.

On the other hand, the evidence established, and the commission found, that in 1925, with the seven cent rate in effect, the net revenue of the water department was $1,118,168, after deducting the operating expenses, without, however, charges for the services of city officers and other departments and for rent of extensive offices in the city hall. That net revenue is $241,832 less than the sum of $1,360,000, required to produce eight per cent. upon a $17,000,000 valuation.

The plaintiffs contend that the revenue of the water-supply business would have been considerably more if the city had properly charged itself for fire-protection services. The commission held that the mere charge of $45,970, at the rate of $10 per hydrant, did not cover the cost of that service. However, the commission rightly concluded that, inasmuch as the revenues fell short by $241,832 of meeting the expenses and providing a fair return, the city, in fact, to the extent of the shortage, carried the cost of conducting the water business; that the cost to the city for fire-protection service amounted not only to the $45,970, but to that amount

plus the shortage, or a total of $287,802; and that, consequently, the commission could not hold that the furnishing of fire-protection service to the city at the cost to the city of its water-supply business resulted in an unjust discrimination against users of general service.

Of course, if the commission had computed the return to which the city was entitled upon a valuation which would have given due consideration to the reproduction cost of the property, then the burden to the city, whether considered additional expense for fire-protection service, or the general cost to the city of conducting the water-supply business, would have been greatly in excess of $241,832. Likewise, upon adoption of the proper method of valuation, the commission would have concluded that the city was entitled to a net revenue considerably in excess of the $1,118,168 earned in 1924.

It follows that the rate of seven cents per 100 cubic feet, plus the annual service charge of $2 per meter, does not permit the city to earn an excessive return on the reasonable valuation of its water plant.

Can this court rightly disturb or set aside, as without basis in reason, or as not within the zone of reasonableness, the commission's conclusion that it was unable to determine that the rate of seven cents per 100 cubic feet, in connection with the annual service charge of $2 per meter, was unjust, unreasonable, and unjustly discriminatory against consumers of large quantities of water? As the commission stated in its decision:

". . . The public utility law does not provide, either as to individuals or as to classes, that the rates shall exactly reflect the cost of service. . . . There is no attempt in the statute to denominate as unjustly discriminatory a rate which may not conform strictly to the cost of service. The statute seems to contemplate that the commission, in fixing rates for various classes of service, may properly consider all factors having a bearing upon such rates, and not merely

the question of the cost of serving a particular class. The testimony introduced on behalf of the city of Milwaukee is to the general effect that the determination of the so-called 'cost curve' is only a step in arriving at a proper schedule of rates; that such rates need not conform closely to the cost curve; and that the determination of the schedule to be charged, assuming that the total return is not to be excessive, is largely a function of management. To define the limits within which the fixing of rates is a function of management, and beyond which it becomes a problem of regulation, would probably be extremely difficult; but we think that to some extent at least the city's claim that the determination of the type of schedule properly lies within the field of management can be sustained."

It appears that in the water-supply business but little has been done to so correctly adjust the schedules that each individual, within a class, has a rate adapted to the cost of serving him. Proposed methods of determining the service cost involve apportionments of cost of property investments, and of operating expenses, which at present are quite arbitrary. Classifications based merely on quantity consumed or the uniformity of demand overlook the complications of the problem in the water-supply business because of such matters as material increases in the cost of supplying water due to variations in distances from and elevations above pumping plants, and the extraordinary cost of subaqueous tunnels and other extraordinary equipment necessary to supply some parts of the territory served, as compared to other parts. So the commission properly concluded that:

"Even if we were to attempt to fix the rates on the basis of the relative cost of serving large and small consumers, it would be a practical impossibility to frame a rate schedule which would accurately represent the difference in the cost of serving individuals within the same class."

Furthermore, the proof established that in the city of Milwaukee, owners of property abutting on the street had to pay one half of the cost of installing a standard size water

main, and the full cost of the service pipes from the main to the meter, and of the meter. If to the total interest charge on that investment of the consumer there is added the annual $2 per meter service charge, the actual average cost to users of given quantities of water is, in effect, graduated approximately as follows:

| Consumers using | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| " | " | 10,000 gals. | per | year, | | 61.8 | ¢ per | 1,000 | gals. |
| " | " | 20,000 | " | " | " | 35.5 | ¢ " | " | " |
| " | " | 60,000 | " | " | " | 18 | ¢ " | " | " |
| " | " | 100,000 | " | " | " | 14.5 | ¢ " | " | " |
| " | " | 500,000 | " | " | " | 11 | ¢ " | " | " |
| " | " | 1,000,000 | " | " | " | 10.1 | ¢ " | " | " |
| " | " | 5,000,000 | " | " | " | 9.67 | ¢ " | " | " |
| " | " | 50,000,000 | " | " | " | 9.38 | ¢ " | " | " |
| " | " | 500,000,000 | " | " | " | 9.34 | ¢ " | " | " |

Hence, as the commission concluded:

"We have, then, the situation that the present meter rate is, in fact, not a uniform meter rate, but that it does result, when all the facts are considered, in a much higher charge per unit of consumption for the small customer than for the large customer, and that to the extent that this is true it approximates the form of the cost curve. We have the fact, also, that the statute does not require that rates be based strictly on the form of the cost curve, and the further consideration that, to an extent which we will not attempt to define, the form of rate schedule to be applied lies within the field of management."

It follows that there was ample basis in reason for the conclusion of the commission that it was unable to determine that the rate schedule filed by the city is unjust, unreasonable, or unjustly discriminatory. The commission's results are well within the zone of reasonableness, and must be judicially approved.

*By the Court.*—Judgment affirmed.