CITY OF MILWAUKEE, Appellant, vs. RAILROAD COMMISSION OF WISCONSIN and others, Respondents.

*October 15, 1931—January 12, 1932.*

340

*John M. Niven,* city attorney, for the appellant.

For the respondent Milwaukee Electric Railway & Light Company there was a brief by *Shaw, Muskat & Sullivan* of Milwaukee, and oral argument by *James D. Shaw.*

For the respondent Railroad Commission there was a brief by the *Attorney General* and *Samuel Bryan,* assistant attorney general, and oral argument by *Mr. Bryan.*

On behalf of all defendant municipalities there was a brief by *Laurence C. Gram,* attorney for the city of West Allis; *George H. Gabel,* attorney for the village of Whitefish Bay; *Albert B. Houghton,* attorney for the city of Wauwatosa; *C. R. Dineen,* attorney for the towns of Granville and Milwaukee; *Herbert O. Wolfe,* attorney for the village of Shorewood; *J. Schoendorf,* attorney for the town of Lake; *Edward G. Minor,* attorney for the city of Cudahy, and *M. H. Herriott,* attorney for the village of Fox Point; and the cause was argued orally by *Mr. Houghton.*

FRITZ, J.   The proceedings before the Railroad Commission were commenced by a petition filed by the Milwaukee Electric Railway & Light Company (hereinafter called the Railway Company), in which it alleged that the rates of

fare on its system were inadequate; that it had been compelled to use part of its earnings from the electric light and power business, in which it was also engaged, to make necessary extensions and improvements of its street railway, and that it doubted the propriety of such diversions of money from its light and power earnings; that it requested an examination of the characteristics of the existing single-fare area and the grant of such rates as would enable the Railway Company to earn a fair return. The company offered to place in effect reduced rates for electric current equal to whatever increased revenues were realized from the increase in fares. The city of Milwaukee petitioned that the existing single-fare area be extended to include the former city of North Milwaukee, and also other territory, which had recently been annexed. Ten adjacent municipalities, which are in the Milwaukee metropolitan area and are served by the same railway system, also filed petitions.

The commission in its decision said:

"In prescribing rates of fare we must deal with the system as a whole. . . . All of the suburban and city systems should be handled as one system serving one metropolitan area. . . . Since the original zone prescription the areas in which zone fares apply have undergone a growth commensurate at least with the growth of the single-fare area. These zones still fail to pay their way, but with the development of the areas appear each year to be less of a drain upon the system. The time has arrived, we believe, when it will be entirely consistent and proper to eliminate some of this zone area and include it in a single-fare area. It is to all intents and purposes today a part of the area served by the urban system and we see no reason why it should not be included."

The commission found that during 1928 the Railway Company failed to earn a fair return on the rate base in the single-fare and suburban areas; that the single-fare area

should be extended so as to include all lines within a radius of 5.5 miles from the traffic center, instead of only 3.7 as theretofore, as a result of which the first two extra-fare suburban zones were included in the single-fare area; that a reasonable fare, within the single-fare area, is ten cents or six tickets for fifty cents—instead of the former rate of seven cents or eight tickets for fifty cents,—or a weekly bearer pass for one dollar; that for each zone of approximately one mile, and lying beyond the new single-fare area, the fare should be three cents or twenty tickets for fifty cents, instead of twenty-five tickets for fifty cents as theretofore. Details as to minimum fares within zones, reduced fares for minors, etc., which are immaterial on this appeal were also provided for. In its decision the commission said:

"The additional revenues of approximately $400,000 which this order contemplates will not give a fair return upon the value of the railway property. However, with conditions in the street railway business as they are, it would not be possible to prescribe rates of fare which would assure the company a return of seven and one-half per cent."

On its appeal the city of Milwaukee assigns as error that the circuit court and the commission erred in holding that the Railroad Commission was authorized to adopt the regional unit system for rate-making purposes, and to disregard city limits in fixing a single-fare area, which included suburban territory that had failed to pay its own way, whereby some of the burden of suburban transportation was loaded on the city of Milwaukee. The city of Milwaukee contends that, prior to and since the creation of the commission, the city of Milwaukee was the recognized unit in providing street railway service for its inhabitants, and that no express authority was given by statute to the commission to disregard the city limits in fixing rates, and no such power will be implied. The city relies on the decision in *Eau Claire v. Wis.-Minn. L. & P. Co.* 178 Wis. 207, 189

N. W. 476, which held that the commission was not authorized to treat a group of cities as a unit in fixing the rates of a public utility for electric current, but that each municipality constituted a unit. That decision related to public utility rates and not to street railway rates, consequently it is not controlling in the case at bar. Even as to public utility rates sec. 196.03, Stats., was amended after that decision by ch. 390, Laws of 1929, so as to authorize the commission to consider two or more municipalities as a unit "if in its opinion public interest so requires." The opinion in the *Eau Claire Case* expressly recognized the rule followed in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 171 Wis. 297, 177 N. W. 25, as to railway rates, viz. that the true test of the reasonableness of a rate is its effect upon the entire railway system—suburban as well as urban— which is operated by the railway as a common carrier, regardless of whether a particular part thereof is operated at a profit or a loss under the prescribed rates. The "entire system" as found by the commission under the evidence in this case consists of the suburban and city system which serves the one metropolitan area, consisting of eleven political and municipal units, which together constitute but one contiguous, compact, and quite homogeneous community. The evidence warranted that finding, and the commission's announcement, after extended consideration, with the advantage and benefit of the expert technical knowledge which was at its disposal, must be accorded the greatest deference and should be set aside only with great caution and reluctance. *Eau Claire v. Wis.-Minn. L. & P. Co., supra; Oshkosh W. W. Co. v. Railroad Comm.* 161 Wis. 122, 127, 152 N. W. 859.

If the former single-fare area had produced sufficient to enable the railway to earn a fair return on the rate base for that area in 1928, so that no increase in fare for that area would have been warranted, city patrons might have

been prejudiced by the addition of an unprofitable extra-fare zone to the existing single-fare area, in immediate connection with a contemporaneous increase in the single fare for the new enlarged single-fare area. But as insufficient revenue in 1928, to yield an adequate return upon the rate base, necessitated an increase in fare for the then existing single-fare area at all events, the order increasing the fare cannot be considered unreasonable or unlawful so as to justify the setting aside thereof by a court. (sec. 196.46, Stats.) solely because of an increase in fare. That increase was necessary and proper at all events under the evidence and the findings of the commission. Whether, in that connection, "it is probable," as the commission announced, "that the maximum riding on the public transportation system of the Milwaukee metropolitan area will be promoted by extending the single-fare area," involves the exercise and application of expert technical knowledge, and sound, competent business · judgment, which, when finally acted upon by the commission in determining that the enlargement of the single-fare area, in connection with an increase in fare which the commission likewise determined was necessary and proper, cannot rightly be set aside by the court unless shown, by clear and satisfactory evidence, to be confiscatory or otherwise unreasonable and wrong.

The city of Milwaukee contends that for a long period of years the city and its traveling public acquired certain natural rights as to rates of fare in the street-car system; that certain provisions of the 1900 franchise were contractual, and contemplated that the entire city of Milwaukee, as then constituted or as thereafter extended, shall have a uniform rate of fare; and that the city as such shall be entitled to all the advantages of the single-fare area without being prejudiced by the inclusion of other territory in that area. It is true that the franchise, granted by the city to the Railway Company in 1900, did provide that the rate of fare

within the city limits should not exceed five cents. The city contends that five cents was also to be the fare in case of the extension of the city limits and of the railway's lines within such extended limits. But the evidence disclosed that the single-fare area has not always been coextensive with the city limits since 1900. When the commission made its first order as to such area in 1914, it included suburban territory which was about forty-seven per cent. of the territory which was then within the city. If, as the city now contends, the inclusion of such suburban territory is prejudicial to patrons within the city in fixing the rates, that policy of including suburban territory within the single-fare area has been in effect since 1914. However, as a matter of law, it is well established that franchise provisions as to street railway rates which are in derogation of the exercise of the sovereign power of the state with respect to such rates, are void and of no effect upon the exercise of such power by the state; and that in this state that power to control street railway rates is vested in the Railroad Commission. *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925; *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491; *Milwaukee E. R. & L. Co. v. Railroad Comm.* 238 U. S. 174, 35 Sup. Ct. 820. In *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491, this court held, in relation to that 1900 franchise, which was then and is now under consideration, that so far as the state is concerned, the ordinance constitutes no obstacle to the exercise of its power to regulate rates.

The city of Milwaukee further contends that the inclusion of the suburban area in the single-fare zone is contrary to fundamental principles of rate making, and is therefore unreasonable. Counsel for the city asserts that the basic principle of all rate fixing is the cost of service, and that the principal factors in cost of service are the distance and the load. However, counsel also recognizes that other

factors, which he terms "sociological," have been allowed to enter into the question of fares, and that therefore the cost-of-service principle has not been strictly adhered to. He says:

"Under this system no differentiation is made between the initial portions of the area where the traffic is heaviest and where consequently each rider should, strictly speaking, pay a smaller rate of fare, and the outlying portions of the area where the traffic is lightest. The basic reason for such a system is that the traveling public possesses a community of interest which justifies the imposition of the same rate of fare upon all of the patrons regardless of cost. The only theory upon which such imposition may be made is that it is warranted by a community of interest."

But he then contends that such community of interest and the consequent sociological factor end at the city limits.

After thorough study and consideration the commission concluded otherwise as is indicated, in part, by the following excerpts from its opinion:

"Nor can the commission subscribe to the theory that it must give primary consideration to municipal limits in prescribing fares. There is no reasonableness in the assertion that street-car fares should be based upon the operation of the street-car system within the corporate boundaries of any municipality, regardless of the effect of those fares upon the portions of that system lying outside. To carry that theory to its logical conclusion would mean, in the great majority of instances, that there would be no street-car service beyond corporate limits, because no suburban travel at the outset would support a system under rates which were not prohibitive of riding. . . .

"So inextricably interwoven with the city's development has become the development of the suburbs of Milwaukee that the commission is convinced that to treat the single-fare area as separate and apart from the suburban area would be more of a mistake than it would have been in earlier orders. The suburbs have kept pace in their growth with the city. It has been demonstrated so many times, not only

in the case of the Milwaukee system, but as well in other cities of the country, that it is an impossibility for the suburban portion of a street railway system to pay its own way, that there is no need of a further showing. The prescription of fares in the suburban area that would attempt to make that area self-supporting would not only operate against the very purpose for which such fares were prescribed, but would have a decidedly unfavorable reaction in the single-fare area itself, because a not negligible amount of the riding in the single-fare area is traffic that originates or ends in the suburban area. . . . The treatment of suburban and urban systems as constituting one metropolitan area has many precedents in actual practice, some of which are to be found in Milwaukee county. The same company in this proceeding serves all suburban areas to and within which its railway system operates, as a metropolitan area, there being no difference in schedule rates for electric current in West Allis or Wauwatosa or Shorewood and the schedule in the city of Milwaukee proper. Telephone rates are the same at all exchanges within the metropolitan area, whether those exchanges serve urban or suburban patrons. The city is itself interested in the Metropolitan sewage district, which makes no distinction for corporate boundaries. Economically and socially the city and the suburbs are a unit. The merchants in the 'downtown' district draw upon the suburbs for a portion of their trade, and many in return therefor give free delivery in those suburbs. It would appear that they must be interested in doing away with any artificial barrier of city limits that hinders their tapping of this suburban area. The suburbs are interested because any barrier between them and the city in the transportation cost to their residents means a retarding of the growth of the suburbs. . . . From the viewpoint of transportation, there are no city limits of Milwaukee, the only recognizable limits being those of the system's operation."

The commission's conclusions, and reasons therefor, as quoted, are sound. The time had evidently arrived when certain portions of the former extra-fare zone areas were, to all intents and purposes, part of the area served by the urban system and, consequently, it was reasonable and

proper to include those portions in the new single-fare area. That conclusion is in accord with the decision in *United R. & E. Co. v. West,* 280 U. S. 234, 252, 50 Sup. Ct. 123, 74 Lawy. Ed. 390, 410, regarding the reasonableness of an order fixing rates for the Baltimore Street Railway system. As a part of that system there was a railway line leading to Halethorpe, an unincorporated community lying outside the city limits of Baltimore. It was held to be within the power of the state commission to include this entire line within the single-fare area for rate-making purposes even though, if so included, the Halethorpe line would be unprofitable. The court said:

"Complaint also is made of the action of the commission in abolishing the second-fare zone established by the company on what is called the Halethorpe line, and substituting a single fare for the two fares theretofore exacted. Halethorpe is an unincorporated community lying outside the limits of Baltimore city. With a single fare, the extension of the line to Halethorpe is not profitable, but nevertheless it is an integral part of the railway system, and it will be enough if the commission shall so readjust the fares as to yield a fair return upon the property, including the Halethorpe line, as a whole. If, in doing so, the commission shall choose not to restore the second fare, but to retain in force the single fare, we perceive no constitutional objection." (Page 253.)

The Railway Company, under its notice to review, does not seek to vacate the commission's order as an entirety. Its counsel state that it seeks a review of the principle involved in that portion of the order which, by abolishing some of the zone fares in extending the single-fare area, deprives the Railway Company of annual revenue estimated at $330,804, which the abolished zones formerly yielded. In that connection it is claimed that, as a result of that loss, the proposed annual increase, by reason of the newly-raised fares within the single-fare area and also in the remaining

zones (which the commission estimated at \$813,942, on the basis of the 1928 traffic), would be decreased to \$480,138. The Railway Company seeks review of the principle involved to the end that further impairment of the capacity of the metropolitan railway system to become self-supporting may be curbed.

In considering the Railway Company's contentions, it must be noted that, for over thirty years, it has been operating an electric utility as well as a street railway system; that during recent years its railway system has not been able to carry on and meet necessary expenditures for railway operations, maintenance, and extensions out of its revenues, notwithstanding the fact, undisputed in these proceedings, that it is one of the best managed street railway systems of its kind in the United States; and that during those years it has had to rely upon the financial assistance which it obtained from its electric utility revenues. It is also conceded by the parties that the commission's order, which is under review, will not net a fair or adequate return to the railway system on the rate base, which was found and adopted by the commission under the evidence. Thus, the commission said:

"Even had we subscribed to all the proposals that the city makes in relation to changes in the income and the property and plant accounts, the net income would still have fallen short of giving a fair return upon the value of the railway property. The additional revenues of approximately \$400,000, which this order contemplates, will not give a fair return upon the value of the railway property. However, with conditions in the street railway business as they are, it would not be possible to prescribe rates of fare which would assure the company a return of seven and one-half per cent. Immediately the fare is increased to the point where it restricts riding, net income decreases. So the company must be content with the increase which it is estimated will result from the application of the new fare

schedule. Any further increase in net operating income must come from further economies in the operating of the lines."

On the trial, a statistician for the commission testified "that except for the earnings and credit of its electric utility it would be very difficult for the company to comply with the various orders of the commission directing the expenditure of additional capital for railway extensions and additional equipment."

In view of that state of affairs the Railway Company considers itself confronted with this problem: "Can the company safely continue to acquiesce in the practice of regulating the transportation system on the basis of the combined earnings of both its electric utility and transportation systems serving the metropolitan area? If so, what are the approximate limitations upon the use of electric utility earnings for the support of the transportation utility?" In that connection its counsel concede that "All claims of the company based upon alleged confiscation fall by its own admission if regulation on the basis of the combined earnings of the company's Milwaukee public service properties is permissible." In so far as that legal question is concerned, the answer to the problem depends upon the extent of the power which the legislature has conferred upon the commission. As this court has said on several occasions, "The Railroad Commission being a tribunal of purely statutory creation, its power and jurisdiction must be found within the four corners of the statute creating it." *Chippewa Power Co. v. Railroad Comm.* 188 Wis. 246, 205 N. W. 900; *Monroe v. Railroad Comm.* 170 Wis. 180, 174 N. W. 450; *Madison Rys. Co. v. Railroad Comm.* 184 Wis. 164, 198 N. W. 278; *Eau Claire v. Wis.-Minn. L. & P. Co., supra.*

As to railway rates, the statutes relating to the power of the commission, when properly invoked, provide that it is to fix "such rate, fare, charge or classification as it shall deter-

mine to be just and reasonable" (sec. 195.04, Stats.); that whenever it finds any existing rate, etc., "is unreasonable or unjustly discriminatory," it shall fix "a reasonable rate . . . in lieu of that found to be unreasonable or unjustly· discriminatory or inadequate" (sec. 195.05 (1), Stats.); and that "the charges made for transportation of passengers or property . . . shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful" (sec. 195.08 (1), Stats.). In relation to public utilities, similar statutes, but in another chapter, provide that "the charge made by any public utility for any heat, light, water or power . . . shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful (sec. 196.03 (1), Stats.); that upon complaint or whenever it believes that any rate, regulation, or service is "unreasonable, insufficient or unjustly discriminatory," the commission shall investigate (sec. 196.26 (1), Stats.); and that whenever upon investigation "the commission shall find rates, tolls, charges, schedules or joint rates to be unjust, unreasonable, insufficient or unjustly discriminatory, or preferential or otherwise unreasonable or unlawful, the commission shall determine and by order fix reasonable rates . . . in lieu of those found to be unreasonable or unlawful" (sec. 196.37 (1), Stats.). There is no provision within the four corners of the statutes creating the Railroad Commission which expressly, or by implication, authorizes the commission, in prescribing regulations and rates for railway transportation which fail to net reasonably adequate returns upon the value of the railway property involved, to compel the owner thereof to use its earnings from its public utilities operations to meet a deficit incurred in its railway operations. Such railway service regulations and rates are not merely unauthorized, but, on the other hand, they necessitate charges for public utilities services, which, in order to make

up for the deficit in the railway department, must be in excess of a reasonable return on the property used in providing the utility services and which, consequently, are therefore likewise unreasonable, prohibited, and in violation of sec. 196.03 (1), Stats.

The question as to when orders of the Railroad Commission are unreasonable and confiscatory, as those terms are used in chs. 195 and 196, Stats., was considered by this court in several cases. In *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 167, 116 N. W. 905, this court said:

"An unreasonable order is an unlawful order. . . . Confiscatory orders are ordinarily, but not always, unlawful or unreasonable. In order to be fairly termed confiscatory the order must deprive the railroad of a fair return upon the value of its property, not merely reduce former rates or charges. . . . In determining whether or not the order of the commission is unreasonable, it must also be considered that every unnecessary burden imposed upon the railroad impairs its net receipts and diminishes that margin, if there be one, between the amount sufficient to assure a fair return on the value of its property, plus the amount of its fixed charges and operating expenses, and its gross receipts. In this margin the public and the railroad are interested, because it is only when this exists that betterments in construction or improvements in service not imperative or indispensable, or reduction in rates, will ordinarily be voluntarily made by the railroad or can ordinarily be ordered or enforced by the commission."

In *Duluth St. R. Co. v. Railroad Comm.* 161 Wis. 245, 261, 262, 152 N. W. 887, the court said:

"It is pretty well established that the privately owned street railway should be permitted to earn its reasonable and necessary expenses, including a reasonable sum for depreciation, as well as a fair rate of return on the reasonable value of the investment. . . . Where rates are so adjusted as to yield a fair return on the value of the property over and above expenses and depreciation, they are reasonable." A

net return of seven and one-half per cent. was approved by this court.

Next, in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 169 Wis. 421, 428, 172 N. W. 746, this court said:

"It may be remarked in passing that if it fixed an unreasonably low fare it was unlawful because the fare must be a reasonable fare. . . . A reasonable rate is a rate which yields a fair return on the value of the property necessarily employed over and above expenses and depreciation, and a return of seven and one-half per cent. has been approved by this court." Citing *Duluth St. R. Co. v. Railroad Comm., supra.*

Later, in *Waukesha Gas & Elec. Co. v. Railroad Comm.* 181 Wis. 281, 287, 194 N. W. 846, this court said:

"When the properly constituted authorities have established a rate, which rate is by reason of insufficiency confiscatory, the courts have the power, in the enforcement of the provisions of our constitution, to set the rate aside. *Smyth v. Ames,* 169 U. S. 466, 522–26, 18 Sup. Ct. 418; *Interstate Comm. Comm. v. Union Pac. R. Co.* 222 U. S. 541, 32 Sup. Ct. 108; *Madison v. Madison G. & E. Co.* 129 Wis. 249, 108 N. W. 65. . . . In order for the court to ascertain whether or not a rate prescribed by the commission is reasonable, it must first determine the present fair value of the property actually used and useful for the convenience of the public. This value when established constitutes the rate base and is the amount upon which the utility is entitled to earn a reasonable return."

Those principles were also applied in *Pabst Corp. v. Railroad Comm.* 199 Wis. 536, 538, 227 N. W. 18. As, in the case at bar, the commission concedes that the additional revenues under the order of May 1, 1930, "will not give a fair return upon the value of the railway property," and it appears that the regulations and rates prescribed by that order necessitate using earnings of the Railway Company's electric utility to meet the deficit in its railway operations, that order is confiscatory, unreasonable under, and unauthor-

ized by, the Wisconsin statutes cited above. To the same effect, in relation to an act of Congress relating to the powers of a public service commission, see *Potomac Elec. P. Co. v. Public Utilities Comm.*, P. U. R. 1920 C, p. 326, 276 Fed. 327, 51 App. D. C. 77.

It follows that the commission's order of May 1, 1930, must be reversed. In that connection, however, it is not within the judicial power to determine what regulations and rates should be prescribed instead. "The result of the reversal of the order of the commission is not to establish this fact or ascertain this point of reasonableness, but to leave it undisclosed, leaving the former rates to stand or requiring the commissioners to try over again to find it. In reviewing the order of the Railroad Commission the inquiry is not whether the rate, regulation, or service fixed by the commission is just and reasonable, but whether the order of the commission is unreasonable or unlawful. The nature of the inquiry is changed at this point, and the court is not investigating for the purpose of establishing a fixed point. Whether or not the order is within the field of reasonableness, or outside of its boundaries, is the question for the court." *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm., supra.* Consequently, this court, in reversing that order, is not authorized to preserve or to substitute for the order in its entirety, merely those portions thereof which relate to the increase in the fares. The power to determine what constitutes a reasonable fare or regulation—as, for instance, whether the order of May 1, 1930, amended so as not to include two of the extra-fare zones within the single-fare area, but otherwise left to authorize the increased fares, would be reasonable—has been intrusted by the legislature to the commission, and is not within the judicial powers. Consequently, this court cannot, in connection with its decision that the order of May 1, 1930, is unreasonable, substitute therefor its determination that a similar order, from which there has been eliminated the provision as to the inclu-

sion of the two extra-fare zones in the single-fare area, is reasonable, and shall be adopted by the commission upon remanding the record.

The opinions in *State ex rel. Daniel v. Broad River Power Co.* 157 S. C. 1, 153 S. E. 537, and *Broad River Power Co. v. South Carolina,* 281 U. S. 537, 50 Sup. Ct. 401, which have been cited by counsel, do not pass upon the power of a public service commission to prescribe rates or regulations for railway service which could only be complied with by also using public utility revenues to meet the railway operation burdens. In those cases, compulsory continued operation of a street railway, at an operating loss which necessitated resorting to the owner's utility revenues, was held not to be confiscatory, or to deprive such owner of its property in violation of amendm. XIV, U. S. Const., when the owner was required to continue to furnish the railway service by reason of some franchise or other public obligation which it had theretofore voluntarily assumed. Those decisions may afford some basis for the legislature, if it determines that such action is desirable, as a matter of public policy, to authorize a commission to prescribe the diversion of revenue from an owner's public utility business to its railway department, when the owner is required by franchise, or otherwise, to maintain street railway service regardless of the inadequacy of the revenue produced thereby. However, the public policy of the state is a matter for determination by the legislature. Until the proposed public policy is embodied in legislative enactments, it affords no basis for enlargement of the power of a commission by judicial construction of the statutes, which, when enacted, were not intended to apply to such economic problems as are involved in this case.

Exception was also taken by the Railway Company to the estimated allowance by the commission for depreciation. The difference of opinion arises primarily because of the experience which the Railway Company claims to have had

during the past decade with foreshortened life of property due to unusual conditions in relation to alterations and replacements. In the order under review the commission said that it "is not ready to concede that the company's experience with foreshortened life of property during the past decade is a criterion of a situation that is to continue. The evidence in this proceeding indicates that the depreciation allowance is not excessive and there is no necessity of making a finding as to its adequacy." This again is a complicated engineering and accounting problem. There may be a detail error in judgment, but it has not been shown by clear and satisfactory evidence that the commission's determination as to the proper formula to apply in allowing for depreciation is unreasonable. Consequently, the trial court was right in not disturbing that determination. Sec. 196.46, Stats.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment, upon the cross-complaint of the Milwaukee Electric Railway & Light Company, vacating and setting aside the order of the Railroad Commission dated May 1, 1930.