WISCONSIN HYDRO-ELECTRIC COMPANY, Respondent, vs.
RAILROAD COMMISSION, Appellant.

*April 10—May 12, 1931.*
*February 12—June 20, 1932.*

350

For the appellant there were briefs by the *Attorney General* and *Samuel Bryan,* assistant attorney general (*David E. Lilienthal* of counsel on rehearing), all of Madison, and oral argument by *Mr. Bryan* and *Mr. Lilienthal.*

For the respondent there were briefs by *Sanborn, Blake & Aberg* of Madison, and oral argument by *Chauncey E. Blake* and *John B. Sanborn.*

There was also a brief by *R. M. Rieser* and *Olin & Butler* of Madison, as *amici curiæ.*

The following opinions were filed May 12, 1931:

FRITZ, J.   The action was tried upon the pleadings, and there is no dispute as to the facts.   On August 13, 1928,

the plaintiff applied to the Railroad Commission for a valuation under sec. 184.11 (2), Stats., of the property of the Luck Light & Power Company, and a certificate of authority, to be issued by the commission under sec. 184.09, Stats., for the issue of securities to secure funds to pay for the property. On January 17, 1929, the commission issued a preliminary certificate authorizing the plaintiff to issue $58,800 par value of bonds at a discount of ten per cent. to procure funds to pay in part for the property, and reserved for later determination, upon its engineers completing their appraisal, the question as to what additional securities might be authorized against the property.

The Luck Light & Power Company had on its books an account entitled "Customers' Line Extension Donations," showing a balance of $12,034.91 received in cash as donations from prospective customers to finance the construction of a certain high-tension line, transformer installations, and branch-line extensions. That account was carried in that form pursuant to accounting rules, theretofore promulgated by the commission, which required the Luck Light & Power Company, as well as the plaintiff, to credit in such an account all customers' donations, and also to debit the same to the proper fixed capital account on its books. In relation to such donations the answer alleged:

". . . That rural rates in such cases were established upon a basis which did not provide for a return to the utility upon the capital thus donated by customers; that the customers' donation plan above outlined made it possible for the electric utility to establish a lower rate for rural electric service which tended to promote the expansion of rural electrification to the benefit of the utility and also of the public; that the rate schedule of the Luck Light & Power Company under which the customers' donations under consideration were made was constructed upon the principles above set forth and did not permit said Luck Light & Power Company to earn a return upon the amount of said customers' dona-

tions as set forth in the opinion of the commission here under review."

On May 5, 1929, the commission determined that the value of the property was $80,000, free and clear of all incumbrances, but including the donations of $12,034.91 contributed by customers; that $67,965.09 was the maximum amount at which the plaintiff could purchase the property and place it on its books; that the $12,034.91 should be credited on plaintiff's books to the "Customers' Line Extension Donations" account; that "the financial condition, plan of operation, and proposed undertakings of the corporation are such as to afford reasonable protection to purchasers of the securities to be issued;" and that to obtain funds to complete the purchase, in addition to the bonds for $58,800, theretofore authorized, the plaintiff should be authorized to sell 150 shares of its common stock at $100 per share.

Plaintiff contends that it was entitled to capitalize the value of the acquired property without regard to the price which the vendor invested therein; that the commission erred in adopting the sum of $67,965 as the base value for issuing securities instead of the sum of $80,000, at which the commission valued the property; and that the fact that the commission might not be required to include the value of the donated property in a rate base does not justify deducting the amount at which the donation is carried on the vendor's books from the value of the property as determined under ch. 184, Stats., for the issuance of securities.

On the other hand, in its brief plaintiff's counsel say that they do not "challenge the contention that the plaintiff is in the same position as the Luck Company should a question of rates arise." Likewise, plaintiff's counsel concede that when "the contributions were made to the Luck Company the rates in force and approved by the commission recognized that customers in rural communities might help the

company in financing extensions into marginal territory, and that the company was justified in giving such customers a lower rate on that account;" that should plaintiff apply to the commission "to increase its rates to the class of customers who have made such contributions, the fact of such contributions, the time when they had been made, the length of time that had elapsed during which a reduced rate had been given, the extent of that reduced rate, would all be factors which the commission would undoubtedly consider in determining whether or not it would grant an increase of rates;" and further say: "Should the commission determine that a proposed rate increase asked by the plaintiff would unjustly enrich the plaintiff at the expense of customers who have made contributions, we presume the commission would deny the increase, and should the plaintiff bring an action to set aside the order of the commission, the question of the ruling of the commission in this respect would then be before the courts. It certainly is not before the courts now."

The proceedings before the commission, and its determination as to the value of the property, the maximum amount at which it authorized the purchase, and the nature and extent of the securities which plaintiff could issue against the property, were pursuant to secs. 184.11 (2) and 184.09, Stats. 1929. Sec. 184.11 (2) provides:

"No public service corporation shall purchase, or in any way acquire the property of any other public service corporation or of any person furnishing service to the public, for the purpose of effecting a consolidation, unless the property to be acquired shall first be valued as provided in section 184.09, and then only at a sum not to exceed the value found by the commission and stated in the certificate of authority issued to such corporation for the issuance of stocks, certificates of stock, bonds, notes, or other evidence of indebtedness."

That section absolutely prohibits a purchase, such as is involved in this action, unless "the property to be acquired *shall first* be valued as provided in section 184.09," and then further expressly provides that even after such valuation the purchase can be made only at a sum stated by the commission in its certificate of authority to issue securities, which sum shall not exceed the value found by the commission. Sec. 184.09, so far as now material, provides:

"(1) No public service corporation shall issue any securities until it shall have obtained authority for such issue from the commission.

"(2) In case the securities are to be issued for money only, the corporation shall file with the commission a statement, . . . setting forth (a) the amount and character of the proposed securities; (b) the purposes for which they are to be issued; (c) the terms on which they are to be issued, and (d) the total assets and liabilities, and the previous financial operations and business of the corporation, in such detail as the commission may require. . . .

"(3) To determine whether the proposed issue complies with the provisions of this chapter, the commission shall make such inquiry or investigation, hold such hearings and examine such witnesses, books, papers, documents or contracts, as it may deem material. It may also make a valuation of all the property of the corporation if it deems it pertinent. It shall determine the amount of such securities reasonably necessary for the purposes for which the same are to be issued.

"(4) If the commission shall determine that such proposed issue complies with this chapter, and that the financial condition, plan of operation and proposed undertakings of the corporation are such as to afford reasonable protection to purchasers of the securities to be issued, it shall issue to the corporation a certificate of authority, stating: (a) The amount of such securities reasonably necessary and the character of the same; (b) the purposes for which they are to be issued, and (c) the terms upon which they are to be issued. . . .

"(6) Such corporation shall not apply said securities to any purpose not specified in such certificate, nor issue such securities on any terms not specified in such certificate."

That section likewise absolutely prohibits the issuance by any public-service corporation of any securities for money only, until it shall have obtained a certificate of authority for such issue from the commission. The corporation is required to file with the commission a verified statement which shall state, among other specified matters, the "previous financial operations and business of the corporation." The commission may make a valuation of all the property if it deems it pertinent, and is expressly required to "determine the amount of such securities reasonably necessary for the purposes for which the same are to be issued." To entitle the corporation to the certificate, the commission must determine that the proposed issue complies with ch. 184, Stats., and that (1) the financial condition, (2) plan of operation, and (3) proposed undertakings are such as to afford reasonable protection to purchasers of the securities. Consequently, when plaintiff desired to acquire the Luck Company property and issue securities to raise money for its purchase, because of secs. 184.09 (1) to (4) and 184.11 (2), Stats., it could not consummate the purchase until the commission had appraised the property and stated in a certificate (authorizing the issuance of securities) a purchase price, which could not exceed the appraised value; and plaintiff could not issue any securities until it had obtained from the commission a certificate authorizing such issue. But to entitle plaintiff to the issuance of such a certificate there had first to be a determination that the financial condition, plan of operation, and proposed undertakings of the corporation were "such as to afford reasonable protection to purchasers of the securities to be issued." Factors which affect the rate

base and the rates are necessarily involved in the "plan of operation" and "proposed undertakings" to such an extent that they must necessarily be considered by the commission in determining whether a project affords "reasonable protection to purchasers of the securities."

Reasonable protection to investors requires more than that the property which is to secure the investments shall be of sufficient value to insure the repayment thereof. To afford reasonable protection the "plan of operation" and the "proposed undertakings" for which the property can be used must be such as to afford reasonable assurance that the probable earnings of the property will be adequate to currently pay interest or dividends upon the investment. And the probable earnings cannot be ascertained without first determining the probable amount of the rate base. In determining that amount it is proper to exclude contributions advanced by customers. *Sutter Butte Canal Co. v. Railroad Comm.* 202 Cal. 179, 191, 259 Pac. 937.

In *Gilchrist v. Interborough R. T. Co.* 279 U. S. 159, 210, 49 Sup. Ct. 282, the court said, in relation to the claim that a utility had the right to have the total value of property, as to which it had but a leasehold interest under a favorable lease, included in the rate base, that it is "unprecedented and ought not to be accepted without more cogent support than the present record discloses."

In the case at bar it is undisputed that the rate schedule of the Luck Company was constructed upon a basis which did not provide for a return to the utility upon the capital which its customers had donated, and that it did not permit the utility to earn a return upon those donations. Plaintiff's counsel concede that the fact of such contributions, the time at which they were made and which has since elapsed during which reduced rates were given, and the extent thereof, would all be factors which the commission would consider

in determining whether it would grant an increase of rates; and in our opinion those matters would all be proper factors for its consideration.

Although, as plaintiff contends, a rate base and a security base are not necessarily the same, still, when it becomes necessary to determine whether the security base affords "reasonable protection to purchasers of securities," the rate base is necessarily involved and must be taken into consideration. The fact that there were substantial donations upon which the utility was not permitted to earn a return, directly and materially affects the probable rates and prospective earnings of the property which is offered as security, and must necessarily be taken into consideration in determining whether the undertaking affords reasonable protection to investors for the interest or dividends on the securities, as well as for the principal invested therein. Consequently, in the case at bar, in order to determine whether plaintiff's proposed undertakings and plan of operation as to the Luck Company property afforded reasonable protection to purchasers of obligations secured by that property, it was proper for the commission to take into consideration the amount of the donations and the consequent rate base.

There is no basis in the record now before us for plaintiff's contention that the commission erred in deducting from the appraised value of the entire property the amount of the original contributions without making any allowance for depreciation on the property represented by those contributions. The record, for instance, is devoid of any facts because of which it can be inferred that the value of the property acquired with the donations has diminished because of wear or deterioration which has not been fully remedied by repairs or replacements, the cost of which was included in the current expense for maintenance and the consequent charges for service, which were paid by the patrons. At

all events, whether now or upon some future application in relation to rates, or otherwise, any deduction should be made for depreciation or obsolescence, in connection with excluding from the rate base the value of property acquired with the donations, involves and depends upon facts which are properly matters for the consideration of the commission, and, if issues of fact arise, the determination thereof is within the province of the commission, as the competent fact-finding body.

Plaintiff also contends that if the statutes authorize the commission to refuse authority to issue securities against the contributed property, such statutes and the commission's order operate to deprive plaintiff of property without due process of law, and deny plaintiff the equal protection of laws, contrary to the Fourteenth amendment of the federal constitution. The contention erroneously assumes that a public utility corporation has the absolute right to issue securities to the full extent of the appraised value of its property. As this court held in *State ex rel. Central S. H. & P. Co. v. Gettle*, 196 Wis. 1, 220 N. W. 201,—in passing upon the authority of the Railroad Commission under sec. 184.09, Stats., as amended in 1927,—the authority of a public-service corporation to issue stocks and bonds is a mere privilege. "It was not in the nature of a natural or inherent right. It was a right which the legislature could take away, at least at any time before the relator came into possession of vested rights. It could also prescribe additional conditions precedent to the conferring of the right. This is what it did by the enactment of ch. 444. Thereafter the Railroad Commission was not authorized to issue such certificate of authority in the absence of a finding by it that 'the financial condition, plan of operation, and proposed undertakings of the corporation are such as to afford reasonable protection to the purchasers of the securities to be issued.' "

It follows that the judgment of the circuit court must be reversed.

*By the Court.*—Judgment reversed, with directions to enter judgment affirming the order of the Railroad Commission.

ROSENBERRY, C. J. (*dissenting*). I find myself unable to agree with the construction placed upon the statute by the court. It seems to me to confuse the statutory provisions relating to the issuance of securities with the law relating to the making of rates. Except as the two matters are drawn together by the opinion of the court, they seem to me to be distinct and unrelated. Inasmuch as the construction now placed upon the statute is conclusive, no useful purpose will be served by more discussion.

The following opinion was filed June 20, 1932:

FRITZ, J. On the motion for a rehearing, argument was ordered. From the briefs and argument upon the rehearing it now appears probable that because of the existence of other material facts than those which are stated in the meager allegations of the pleadings, upon which alone the action was tried, without taking any other proof, the real controversy has not been fully tried. As stated in the former opinion, there were allegations in the answer (which for the purpose of the trial were assumed to be correct) that the rural rates, in the cases in which customers had made donations to finance line construction and extensions, "were established upon a basis which did not provide for a return to the utility upon the capital thus donated by customers; that the customers' donation plan above outlined made it possible for the electric utility to establish a lower rate for rural electric service, which tended to promote the expansion of rural electrification to the benefit of the utility and also of the public; that the rate schedule of the Luck

Light & Power Company under which the customers' dona-
tions under consideration were made was constructed upon
the principles above set forth, and did not permit said Luck
Light & Power Company to earn a return upon the amount
of said customers' donations." Plaintiff now asserts, with-
out challenge by the defendant, that as a matter of fact con-
ditions have changed so as to extinguish all rights which the
original donors may have had in the matter of rates by rea-
son of such donations; and that the donors are now enjoy-
ing the general rates of the plaintiff, which are less than the
rates they enjoyed prior to the purchase of the property by
plaintiff, and less than they ever received by reason of any
special arrangement with plaintiff's predecessor as a result
of their donations. If those changes have occurred, all of
the rights to which the donors were entitled by reason of
their donations may have been satisfied.

So far as the record discloses, defendant refused to per-
mit the issuance of securities upon a basis which included
assets acquired by customers' donations simply because the
rate schedule of the plaintiff's predecessor did not permit
such predecessor to earn a return upon the amount of such
donations. Clearly, in determining the amount of securities
that may be issued upon a public utility property, the ques-
tion of the return which the utility may be permitted to earn
upon its property cannot be ignored. That is one of the
elements which sec. 184.09, Stats. 1929, contemplates shall
be taken into consideration by the commission in determining
the amount of securities that the utility company may be
permitted to issue upon its property. Under the public policy
of this state, as evidenced by its legislative enactments and
recognized by this court in *State ex rel. Central S. H. & P.
Co. v. Gettle,* 196 Wis. 1, 220 N. W. 201, the authority of a
public utility to issue stocks and bonds is a mere privilege
which is subject to such legislative regulations as are pre-

scribed in sec. 184.09, Stats. Rightly, the legislature has not confined the factual basis, which the commission is to ascertain and consider in determining the amount of the security issues, to merely the value of the assets to which the corporation technically has title. On the contrary, after expressly requiring the corporation to submit to the commission, in connection with other data, a verified statement which, among other specified matters, shall state its "previous financial operation and business," sec. 184.09 (4), Stats., provides that the commission is to exercise its power to issue a certificate of authority to the corporation to issue securities only if it determines that (1) the financial condition, (2) the plan of operation, and (3) the proposed undertakings of the corporation are such as to afford reasonable protection to purchasers of the securities to be issued. Manifestly, reasonable protection to prospective purchasers is to constitute an important consideration.

It seems that in the development of similar utilities prospective customers who desired utility service, but who resided beyond the normal zone supplied by the utility, would, in order to secure service, contribute substantial amounts to the utility to defray the expense of extending the service to such customers. Such donations enabled the utility, as in the case at bar, to build the necessary lines and supply the necessary equipment to enable it to furnish to the donating customers the same service which it was furnishing to the public within the normal zone served by the utility. As long as that situation exists, it is apparent that the rates which the utility is permitted to charge should be influenced to some extent, at least, by the fact that the investment necessary to extend such extraterritorial service has been donated by those receiving the service. The extent of such influence, in point of amount and duration, will depend upon the facts and circumstances in each case. When the donors, by their

own contributions, put themselves upon a par, so far as the expense of extending the service was concerned, with those having a right to demand the service of the utility within its normal zone, they should not also be charged a rate which would yield to the utility a return upon the amount of their own donations. True, the title to the property resulting from these contributions vests in the utility, and the utility should be permitted to charge a rate sufficient to cover depreciation of the property and to compensate it for rendering the service. But upon no theory could it be permitted to charge a rate which would yield to it a return upon the investment made by the donating customers to place themselves in a position or relation where the utility could afford to extend its service to them. Where the location of these prospective customers was such as to require a special investment by them in order that they might receive the utility's service, which special investment the utility was unwilling or unable to make, and where the utility was willing to extend its service if such special investment was made by the customers themselves, the utility has no right, as long as that situation continues to exist, to demand a return upon the investment which was thus made by its customers.

However, such conditions may be but temporary and transient. When a public utility of this character extends its original field of operations and service into the rural communities, so that they finally receive regular service in territory where they were theretofore served only by reason of special arrangements with donating customers, the situation is changed somewhat. Such special customers have then become a part of the general public which is served by the utility; and if the facilities by which the utility serves the general public have become all-sufficient to render to such special customers the same service as the utility is rendering, and at the same schedule of rates which the utility is charging, generally in that territory, or the same service that they ren-

dered to such special customers pursuant to the special arrangement, the original relation existing between such special customers and the utility may fade and disappear. Thereupon the reciprocal rights of the utility and the special customers, which existed solely because of the latter's contributions, may terminate. As such special customers have then become part of the general public served by the utility, their right to its service at the same favorable rates as the general public no longer depends upon their special arrangement with the utility, but now exists by virtue of the fact that they are located within the field occupied by the utility and are part of the public which the utility must serve. When the time has come that the rates of the utility to the general public within that field are as favorable to the general consumer as the rates to which the special customers were entitled by reason of their original donations and their special arrangement, then all benefits which they could claim by reason thereof have effectually and completely disappeared.

On the other hand, at all times since the acquisition of the property acquired by using the customers' donations, the legal title thereto has been in the utility. It was completely under the dominion, control, and ownership of the company. No one has had or now has any lien or incumbrance thereon, but the donating customers did have a special right in this property. Although that right was not in the nature of a lien or incumbrance, it was a right which the utility was compelled to recognize in the matter of fixing the rates charged those customers. The accounting rules lawfully promulgated by the commission required the public utility to carry on its books an account in which it credited all such customers' donations; and it was also required to debit such donations to the proper fixed capital account on its books. In due compliance with those rules the Luck Light & Power Company had carried on its books an account entitled "Cus-

tomers' Line Extension Donations," showing a balance of $12,034.91, received in cash as such donations from prospective customers to finance the construction and installation of the branch-line extensions. The rights of the donors had been duly taken into consideration by plaintiff's predecessor and the commission in fixing the utility's charges to the donors. Whatever burden the fact of those donations imposed upon the utility was as officially of record subject to public inspection, and within the constructive knowledge of the public or any purchaser, as if more formal documents in relation to that burden had been otherwise recorded. The plaintiff, as a public utility, was fully charged with knowledge as to such donations.

So in the case at bar, as long as that special right on the part of the donating customers continues to exist, the utility holds the title to the property acquired by virtue of such donations, subject to that special right. However, if in the course of time such special customers become consumers located within the normal zone, which the utility is legally required to serve at a uniform schedule of rates, then their special rights, arising by reason of their original contributions, become valueless. Their original contributions were for a special purpose, namely, the receipt of service up to the time that the utility should occupy the field and assume a position where it became legally bound to furnish service generally at a uniform schedule of rates to all consumers in that zone. With the termination of that special right on the part of the donors, the utility's title to the property thus donated is no longer burdened with any such correlative rights or conditions. The utility as the owner thereof is then entitled to earn the same reasonable return upon the present fair value thereof as it is upon all other property owned by it which is actually used and useful in providing the service. *McCardle v. Indianapolis Water Co.* 272 U. S. 400, 47 Sup. Ct. 144; *St. Louis & O'Fallon R. Co. v. U. S.*

279 U. S. 461, 49 Sup. Ct. 384; *Waukesha Gas & E. Co. v. Railroad Comm.* 181 Wis. 281, 194 N. W. 846; *Pabst Corporation v. Railroad Comm.* 199 Wis. 536, 227 N. W. 18; *Milwaukee v. Railroad Comm.* 206 Wis. 339, 240 N. W. 165. Consequently, when the utility has the present unincumbered title of property burdened with no condition in the nature of any right existing in any other person, and the property is used and useful in accomplishing the purpose of the utility, it is entitled to earn a return thereon; and this right is not affected by the fact that the property was donated to it, if all of the rights which may have originally attached by reason of such donations have been satisfied or terminated. If that has occurred in the case at bar, as is now asserted by plaintiff's counsel, without contradiction, then the commission's refusal to permit the issuance of securities to the full value of the utility's assets, without any deduction because of the original donations, may have been improper.

In the absence of proof as to facts essential to ascertain the present condition and status of the correlative rights of the donors and the utility in the respects indicated above, we are unable to determine whether the commission's action was warranted by existing facts and conditions or was based upon an erroneous view of the law. At all events it does appear that in those respects the real controversy has not been fully tried. It seems probable that in the otherwise commendable effort of counsel to abbreviate the record and the trial, the essential facts have not been presented, and that in the absence thereof a miscarriage of justice may have resulted. Under the circumstances, this court's mandate will be modified as follows:

*By the Court.*—Judgment reversed, with directions to grant a new trial to decide the issues of fact suggested as being yet unsolved, and to then render judgment in accordance with this opinion.